THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILLIAM C. LAMPTON, Defendant-Appellant.

Third District   No. 81—500

Opinion filed July 2, 1982.—Rehearing denied August 27, 1982.

STOUDER, J., dissenting.

Robert Agostinelli and Charles W. Hoffman, both of State Appellate Defender's Office, of Ottawa, for appellant.

Bruce W. Black, State's Attorney, of Pekin (John X. Breslin and Terry A. Mertel, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

On April 14, 1981, a Tazewell County grand jury indicted the defendant, William Lampton, for attempt (murder), armed violence (two counts), and aggravated battery (four counts). Trial was by jury. The jurors returned guilty verdicts on all armed violence and aggravated battery charges. Defendant was acquitted of attempt. Judgment was entered on the first armed violence count. Defendant appeals.

Were the prosecutor's opening remarks so prejudicial as to deny defendant a fair trial? Did the People prove guilt beyond a reasonable doubt? Did the trial judge err in aggravating defendant's sentence, as well as in the degree of punishment imposed? These are the issues in this appeal.

In sum, the People established the following facts. At 4:30 p.m., April 8, 1981, defendant, Edward Lavin, Tom Daly, Bob Ring, and John Cowan were quaffing beers in Gloria's tavern in Pekin. All these men worked together as tradesmen. Lavin and the defendant had known each other for 13 years as fellow union workers. The men continued drinking until about 8:30 p.m. Lavin and defendant began arguing over a work-related incident. Defendant popped Lavin in the chin with his fist. A grappling match ensued. Finally, the two were disentangled. Defendant got up to leave. When exiting, he said to Lavin, "We'll finish this outside later."

The others continued drinking. Thirty minutes later, the four men left the bar. They went into the parking lot to enter Mr. Ring's car. Mr. Lampton, loitering at the rear of the lot, shouted, "Lavin, I want

to talk to you." Lavin told the others he was going to talk to Lampton and try and calm him down. He went over. As he did, Lampton shot him in the stomach with a pistol from a distance of three feet. Lavin fell to the ground. Defendant walked away. Cowan and Ring came to Lavin's aid. He told them Lampton shot him. Then, Lavin blacked out. The police arrived and took him to the hospital. A .38-caliber slug was removed from the victim's abdomen. A forensic scientist testified the slug was from a .38-caliber ammunition.

When Lavin was in the hospital he would not, at first, tell the police who shot him. After five or six days he finally told the police Lampton was his assailant. By then Lavin not only knew the extent of his injuries, but also had conferred with his attorney. When cross-examined, Lavin denied ever telling Cowan or Ring that he did not know who shot him. Also, he disclaimed telling police that on the night of the shooting he was shot as he entered an automobile in the parking lot.

The defendant presented the testimony of 13 witnesses. John Cowan's version of the shooting controverted Mr. Lavin's account. According to Cowan, Lavin was the first to leave Gloria's and he did so alone or with Mr. Ring. Mr. Ring did not testify. After his exit, Cowan heard what he thought was a car backfiring. He went outside. He found Lavin lying wounded in the parking lot. Cowan, as well as Tom Daly, testified they did not hear Lampton say to Mr. Lavin, "We'll finish this outside later." Also, Cowan stated that Lavin never told him he was going to talk to Lampton in the parking lot. Finally, Cowan declared, Lavin did not tell him that Lampton had shot him.

Police officer Terry Ziegenbein testified that on the night of the shooting Lavin said he did not know who shot him. This was corroborated by Pekin policeman Roger Davis and Nels Calbert, the emergency room physician who treated Lavin. Both Calvert and Ziegenbein did testify that Lavin was in a state of shock and experiencing pain due to his wound when they talked with him. Also, they said, Mr. Lavin appeared to be in control of his senses. Dr. Robert Gregorski testified that Lavin's blood alcohol count was 196 when he arrived at the hospital. Such a figure indicates that Lavin was either "drunk" or "under the influence of alcohol" depending upon Mr. Lavin's "experience" in drinking alcoholic beverages.

Pekin policeman Ted Hartman testified he seized a box of ammunition from defendant's truck and a .357 magnum handgun from defendant's home. The People's ballistic's expert, James Roberts, while testifying for the defense, stated the .38-caliber slug removed from the victim's body had not been fired from the seized pistol. Nei-

ther did the slug come from the seized ammunition. The weapon used to shoot the victim is not in evidence.

Mr. Lampton was the next witness. He denied shooting Mr. Lavin. He admitted fighting at the tavern. He explained that recently he was demoted at work and felt Lavin, as a fellow union member, should have spoken out against the job action, but did not. Apparently, such depreciated defendant's pride. After the fight, Mr. Lampton said, he went to the Crazy Horse Saloon in Bartonville, some 10 miles distant. He arrived at 9 p.m. and spoke with Robert Koeppel about a friend. Defendant drank some beer. He left and drove home, arriving around 9:30 p.m. Mr. Lampton was arrested in the early morning of August 9, 1981 by officer Craig Salmon. Officer Salmon said that when informed of the shooting, defendant said he never liked Lavin and if he was shot it could not have happened to a nicer person.

Robert Koeppel owns the Crazy Horse Saloon in Bartonville. Koeppel remembered talking with Lampton on that evening sometime between 5:30 p.m. and 9:30 p.m. Mrs. Lampton testified for the defense. She stated she was not sure when defendant came home on April 8, 1981. When he entered the home she did recall she was putting the couple's nine-year-old child to sleep. The child's usual bedtime was 9:30 p.m. Also, Mrs. Lampton said, to her knowledge, her husband owned only one handgun.

In rebuttal, Pekin policeman James Conover gave testimony. He said defendant told him that he did not know when he came home on the night of the shooting. And, Mr. Lavin said the $1700 found on his person when he was shot was money for a debt he had to pay in court on April 9, 1981. The police had recovered this money from the victim as well as four pills which the police determined were not controlled substances.

Finally, two stipulations were read to the jury. First, Tom Hines, another Pekin police officer, said that John Cowan told him that he never asked Lavin any questions when Lavin was lying wounded in the parking lot. This conversation with Officer Hines occurred on April 8, 1981. And, in testimony before the grand jury, Cowan stated, he had asked Lavin who shot him, but Lavin responded, "I don't know."

After the jury returned their verdicts, a presentence investigation was conducted. A psychological evaluation of the defendant was appended to the presentence report. At the sentencing hearing, evidence in mitigation was presented and considered by the court. No evidence was offered in aggravation. Mr. Lampton was sentenced to 10 years' imprisonment.

In his opening statement, the prosecutor told the jury Bob Ring would testify that he saw a man fitting Mr. Lampton's physical description walk away from Lavin immediately after the shooting. Mr. Ring never testified. Defendant maintains he was denied a fair trial because the People failed to prove those facts they said they would prove at the trial's outset. We disagree.

■ It is error where a prosecutor with foreknowledge includes remarks in his opening statement which are not thereafter proved at trial. This is so because such comments amount to nothing more than a prosecutor's unsworn testimony. (*People v. Rodgers* (1976), 42 Ill. App. 3d 499, 502-03.) But the fact of this omission of proof is not a death knell to a criminal conviction. Only where such delinquency is attributable to the deliberate misconduct of the prosecutor which results in substantial prejudice to defendant does reversible error occur. *People v. Harris* (1979), 70 Ill. App. 3d 363, 368; *People v. Butler* (1973), 12 Ill. App. 3d 541, 548.

In *Butler*, defendant was charged with forgery and theft of postal money orders. In his opening statement the prosecutor announced that a bank president would describe the getaway car and its license number when appearing as a State's witness. Also, such witness would declare that the person trying to cash the questionable money orders left the bank in such vehicle. The witness did not testify. It was held the prosecutor's opening statements, although error, were not reversible error. Several reasons were given for such conclusion. First, the prosecutor cautioned the jury in his opening statement that his remarks were not evidence. Next, the prosecutor did not directly say the bank president would identify the defendant. Finally, the failure to bring the bank president forward was not the result of bad faith on the prosecutor's part. Thus, the court found the prosecutor's opening statement was not prejudicial.

We reach a similar conclusion in the cause at bar. Defendant offered no proof that the People's refusal or failure to call Mr. Ring was done in bad faith. Because the prosecutor could not ascertain the content of Mr. Ring's testimony does not denote the prosecutor's omission to call Ring was done purposefully. Nobody can be certain what a witness will say at a trial. Once the jury was impanelled, various considerations may have arisen which altered the prosecutor's original decision to employ Ring as a witness for the People. Merely because Mr. Ring made inconsistent statements before trial does not mean the prosecutor knew, when he made his opening statement, that he would not call Bob Ring at trial. More than that is required to show the prosecutor's bad faith.

Next, the prosecutor's statement as to Ring's testimony was not direct proof. The prosecutor said the witness could not identify who shot Lavin, but could only describe him. Also, the prosecutor and defense counsel in their opening statements stated their remarks were not evidence, and anything they said would be proven, and if it was not, it should be disregarded. Additionally, in closing argument the prosecutor told the jury to ignore the comments concerning Mr. Ring made in his opening remarks. Defense counsel acknowledged this in his statement. Finally, the trial judge instructed the jury to disregard any opening statement or argument not based on the evidence. For these several reasons we conclude the prosecutor's comment, although erroneous, was not so prejudicial as to deny defendant a fair trial.

Defendant says he was not proven guilty beyond a reasonable doubt. He argues the victim was thoroughly impeached and his failure to name the defendant as his assailant until five days after the offense establishes the improbability of the guilty verdicts.

It is the function of the jury, not us, to assess the credibility of the witnesses and weigh conflicting accounts as to the events in a particular cause. It is within the jury's prerogative to credit or discredit such evidence as it wishes, so long as the evidence as a matter of law leaves no reasonable doubt of guilt. (*People v. Hampton* (1969), 44 Ill. 2d 41, 45.) As a reviewing court we have no authority to insert our beliefs for the collective judgment of the jury.

Apparently, the jury chose to believe Mr. Lavin's version rather than the defendant's view of what happened on April 8, 1981. Although Mr. Lavin did not identify the defendant as the offender until five days after the shooting, Lavin explained why he did not. Having known Lampton for many years as a fellow worker, he did not wish to involve the latter in trouble. Mr. Lavin did not think he was seriously injured. Only when he discovered the gravity of his injuries did he inform the police of Lampton's identity. As to the inconsistencies in Mr. Lavin's testimony, such was for the jury's determination in evaluating his character for truthfulness. The same is equally true with respect to Mr. Cowan's testimony. It was for the jury to resolve any discrepancy. We observe that Mr. Lavin was shot from a distance of three feet in an apparently well-lighted place. His identification of Lampton as the perpetrator, although belated, was unequivocal. (Compare *People v. Gardner* (1966), 35 Ill. 2d 564, 571.) The testimony of a single eyewitness, if positive and credible, is sufficient to convict even if contradicted by the accused. (*People v. Novotny* (1968), 41 Ill. 2d 401, 411-12.) Based on our thorough review of the record, the evi-

dence is not so improbable or unsatisfactory as to raise a reasonable doubt of guilt.

Next, the defendant argues he was improperly sentenced. Allegedly, the trial court incorrectly considered, as a statutory factor, that defendant's conduct caused serious harm. Mr. Lampton maintains that factor is implicit in the offense of armed violence based on aggravated battery. Therefore, since inherent to the offense, such factor should not be used to aggravate a sentence since it is reasonable to conclude the legislature already considered such factor in determining penalties for the offense originally. (Accord, *People v. Conover* (1981), 84 Ill. 2d 400, 404-05.) Alternatively, defendant says his sentence is excessive. On the former contention he asks for a new sentencing hearing. On the latter, he requests a reduced sentence. We decline both invitations.

■■ ■ A trial judge may properly consider in sentencing a defendant, conduct which causes bodily harm even in those cases where great bodily harm is arguably implicit in the offense for which a defendant is convicted. (*People v. Hert* (1981), 95 Ill. App. 3d 871, 874.) The amount of harm sustained by a victim in a given situation varies from case to case. It is not a constant but one of degree. Its consideration depends not on the classification of the offense but the peculiar conduct of the actor, which is an ever-changing variable. A sentencing judge does not err in considering the amount of harm as a statutory aggravating sentencing factor in such context.

Finally, defendant asks us to reduce his 10-year prison term (73 Ill. 2d R. 615(b)(4)), because the trial court purportedly abused its discretion. We will not do this.

■ The range of punishment for armed violence is not less than six nor more than 30 years' imprisonment (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(3)). The trial judge balanced the two aggravating factors of deterrence and the infliction of serious bodily harm against the substantial evidence in mitigation. Even though this was defendant's first offense, a 10-year prison term resulted. It is not our function to attempt to peer into the sentencing judge's mind to ascertain why he sentenced defendant to the term imposed. Such is impossible as it is unwise. We cannot say this punishment, which was at the lower end of the those penalities which might have been levied, contravenes the spirit and purpose of the law. (*People v. Sprinkle* (1974), 56 Ill. 2d 257, 264, *cert. denied* (1974), 417 U.S. 935, 41 L. Ed. 2d 239, 94 S. Ct. 2650.) This offense was a calculated act of harm on another human being. No abuse of discretion occurred.

For the reasons stated, the verdict and judgment of the circuit

court of Tazewell County are hereby affirmed.

Affirmed.

BARRY, P.J., concurs.

JUSTICE STOUDER, dissenting:
I respectfully disagree with my colleagues. In my opinion the defendant was deprived of a fair trial by the prosecution's representation during opening statement about what a witness would testify to when the witness did not thereafter testify.

As observed in *People v. Rogers* (1976), 42 Ill. App. 3d 499, 502-03, 356 N.E.2d 413, "*** the prosecutor cannot comment during his opening statement upon what testimony will be introduced at trial and then fail to produce such testimony. Such arguments and comments effectively assert the prosecutor's own unsworn testimony in lieu of competent evidence." This rule often refers to the representation having been made with knowledge the testimony will not be produced or, in other words, is made in bad faith. The reference to knowledge or bad faith reflects the situation as it is at the time of the opening statement. No evidence has been presented, and the defendant is in no position to object as he may if the statement were made during final argument that it is not based on the evidence or is a misrepresentation of the evidence. Even though the presence of good faith or bad faith is not a factor which should determine whether the defendant has been deprived of a fair trial, the cases sometimes tend to suggest a good-faith representation renders the error harmless and that a representation made in bad faith is less likely to be harmless error.

In *People v. Platter* (1980), 89 Ill. App. 3d 803, 412 N.E.2d 181, and the cases cited in it, the ambivalence of courts in treating good and bad faith representations is demonstrated. After having denied the defendant's motion *in limine* to exclude a doctor's testimony concerning the condition of the child on some prior occasion, the prosecutor in *Platter* (a child-abuse prosecution) represented during his opening statement that the doctor would so testify. When the testimony was offered during the trial the court decided the testimony was too remote in time and ruled it should not be admitted. Clearly the prosecution represented the doctor's testimony in good faith, and the only reason the testimony was not presented was because of an adverse ruling of the trial court. In holding that reversible error was not committed the court emphasized the good faith of the prosecution, an em-

phasis which is understandable but misleading. The implication of the court's reasoning is that if the prosecution knew the doctor would not testify a contrary result might have ensued.

It seems to me that cases such as *Platter* and *People v. Butler* (1973), 12 Ill. App. 3d 541, 298 N.E.2d 798, relied upon by the majority, by references to good or bad faith fail to apply the usual and customary standard in determining whether an error is harmless or not. By not applying the usual harmless-error standard the effect of the error is glossed over. As applied to this type of error, it seems to me that if the representation has some significant probative value concerning a contested material issue in the case it should be regarded as harmless error only if beyond a reasonable doubt it might not have contributed to the verdict of the jury.

Before proceeding further, I think it well to suggest how I believe the good or bad faith of the prosecution should be taken into account. Where the prosecutor has represented during his opening statement that testimony will be presented which is not, then I believe it is his burden to show the failure to produce such testimony was a good-faith omission. If the failure to present the testimony was not made in good faith, then I believe the prosecutor also has the burden of showing the failure did not deprive the defendant of a fair trial. Contrarywise, if the omission was in good faith, then it should be the defendant's burden to establish that the omission did result in unfairness. In most cases these distinctions will make little difference, but at a minimum they should place the burden where it belongs. It would also underscore the nature of the representation itself. The harmful effects of such representation ought not to be excused or ignored merely because made in good faith, nor should the prosecution be penalized merely because of its bad faith.

I have dealt at some length with the issue of good or bad faith because both the majority opinion and *People v. Butler* (1973), 12 Ill. App. 3d 541, 298 N.E.2d 798, the principal case relied on, in finding no reversible error do so by depending substantially on a holding the representation was made in good faith. As I have already said, I do not see how the good-faith characterization of the representation can affect the nature and effect of the representation on the fairness of the trial. In my opinion, the representations were not made in good faith and in any event might have contributed to the verdict of the jury, thereby rendering the error harmful rather than harmless.

During his opening statement the prosecution informed the jury that Bob Ring would "testify that he saw a person walking away from Lavin after Lavin doubled up and he will describe that person to

you and his description will match that of the Defendant, Mr. Lampton. However, he will also tell you, I believe, he could not see the face of the person and he could not say it is Lampton or it isn't Lampton."

Prior to trial, Bob Ring was placed on the State's list of witnesses. Thereafter, the prosecution served a grand jury subpoena on Ring. At a pretrial hearing to quash this subpoena, the assistant State's Attorney asserted that Ring had been subpoenaed because the State believed that he "knew more than what [he] told the police" and perhaps was involved in obstruction of justice. Later, during the trial, in discussing whether certain stipulations would be entered, the prosecutor stated that there were "certain reasons" that he was not going to call Ring as a witness; that Ring had "made several inconsistent statements" and the prosecutor did not know what Ring would testify to if called as a witness.

Contrary to the holding of the majority, the record discloses a classic case of bad faith. When the record shows, and the majority concedes, the witness was not called because the prosecution did not know what he would testify to and because he had made inconsistent statements, I find no support for any conclusion the representation was made in good faith.

This brings me to the representation itself and its potential effect. Could it have contributed to the verdict of the jury? I think in this case the answer must be "yes."

This is a case of the identification of the defendant as the offender by a single witness, the victim. As correctly stated by the majority such identification is sufficient even if contradicted by the defendant to support a conviction. However, the credibility of the victim's testimony is a substantially disputed issue since he did not identify the defendant, although well known to him, for nearly five days after the incident had taken place and after earlier indicating he could not identify his assailant. Anything tending to corroborate the victim's testimony might well have tipped the credibility balance in favor of the victim, and this was the natural effect of the representation of Ring's testimony to come. The seed was planted early in the minds of the jurors that a third party had seen someone of the defendant's description in the parking lot, and I do not see how any of the peripheral advice to disregard the thought or idea could obviate the harmful effect of the error. This is a perplexing problem for trial courts and courts of review. Where an error has occurred and has been recognized during the course of a trial, the nature of the error is in the final analysis the determination of whether its effect can be disregarded and ignored by appropriate instructions. In this case I think

not. Were the credibility of the victim's testimony not so subject to impeachment, maybe it might be otherwise.

In summary, I believe the representation in the prosecution's opening statement to the testimony which was thereafter not produced constituted reversible error and the defendant should be granted a new trial.