THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM SIMPSON, Defendant-Appellant.

First District (4th Division) No. 82—424

Opinion filed December 13, 1984.

824

Steven Clark, Martin Carlson, and Bradley S. Bridge, all of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Jeanette Sublett, and William G. Lacy, Assistant State's Attorneys, of counsel), for the People.

JUSTICE ROMITI delivered the opinion of the court:

Following a jury trial, defendant William Simpson was convicted of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)), and sentenced to 32 years' imprisonment. In this appeal from his conviction, defendant raises the following questions for review:

1. Whether defendant's inculpatory statements to police during custodial interrogation should have been suppressed on the ground that he was arrested without probable cause.

2. Whether the defendant's inculpatory statements to police during custodial interrogation should have been suppressed as involuntary on the ground that he was undergoing heroin withdrawal at the time he made the statement.

3. Whether testimony by defendant's mother-in-law regarding a conversation she overheard between the defendant and his wife was protected by the marital privilege and consequently improperly admitted at trial.

4. Whether the defendant was deprived of a fair trial because certain State witnesses and the prosecuting attorney referred to other

crimes allegedly committed by the defendant, and because of allegedly prejudicial and inflammatory statements by prosecuting attorneys at various stages in the trial.

5. Whether the trial court committed reversible error by refusing to give voluntary manslaughter instructions based upon unreasonable belief in self-defense and based upon sudden and intense passion resulting from serious provocation.

6. Whether the defendant was denied effective assistance of counsel where the trial court refused to grant him substitute counsel to argue a post-trial motion for a new trial based upon his trial counsel's failure to call certain alibi and impeachment witnesses.

7. Whether the defendant was denied effective assistance of counsel where his trial counsel failed to call certain alibi and impeachment witnesses.

We find that the trial court's failure to appoint substitute counsel to argue defendant's post-trial motion for a new trial based upon ineffective assistance of counsel requires remandment of the cause for a new post-trial hearing on this motion, where defendant will be represented by counsel other than the public defender's office. In view of this determination, we do not address defendant's claim that his trial counsel's failure to call certain witnesses constituted ineffective assistance of counsel. We do address defendant's remaining allegations of error, but find them insufficient grounds to grant him a new trial.

The record reveals the following pertinent testimony and evidence. Because the defendant does not argue that he was not found guilty beyond a reasonable doubt, only a summarization of the relevant evidence and inferences therefrom need be restated here.

Defendant was convicted for the murder of William Drake. The evidence produced at the suppression hearing and at trial established that the defendant had suspected Drake of having an adulterous relationship with the defendant's wife, Tecumseh Berry. Defendant and Berry were married on August 7, 1979, while defendant was incarcerated in the penitentiary. Berry testified that she had known Drake for about 16 to 17 years and had been having an affair with him, but that it terminated in August 1980. The defendant was released from prison in August 1980 and moved in with Berry, who was living with her mother and son (defendant was not the father of Berry's son). The record is unclear whether the defendant suspected the involvement between Berry and the decedent prior to his release from the penitentiary or only after he was released and began living with Berry. The record also does not disclose explicitly whether the defendant was aware of their prior involvement when he married Berry, although there was evidence

that the defendant did not personally know Drake or his specific identity before his release. In any event, the record establishes that the defendant, once released, suspected that the relationship had not terminated.

The record indicates that during the first few months that the defendant lived with Berry, the defendant on more than one occasion confronted Berry with his suspicions of her relationship with Drake; when Berry denied any involvement, defendant would become angry. There is some evidence in the record that on at least one occasion the defendant became violent and threatened Berry with a knife during the course of the confrontation. There is also evidence in the record that on at least a few occasions the defendant threatened to "get" Drake because of his relationship with Berry, or made some equivalent threat against him.

The last confrontation between the parties occurred on October 16 or 17, 1980, roughly two weeks before Drake was killed. At that time, Berry, her mother, and Drake were talking in Berry's living room. The defendant entered the room; apparently he had returned to gather his belongings because he was moving out of the residence, since the defendant and Berry were considering divorce. When defendant entered the room and discovered Drake in the presence of Berry and her mother, defendant crudely informed Drake that he wanted Drake to terminate his involvement with his wife. Drake responded that the defendant should not use vulgar language about Berry in front of her mother, and told the defendant that they could discuss the matter outside the presence of the others. The defendant answered that he would "see you [Drake] later" and went to another room to gather his possessions. He then departed from the apartment.

On October 29, 1980, Drake was found lying on the street at the corner of 71st Street and Stewart Avenue. He had one gunshot wound in the lower back. It was stipulated at trial that the gunshot wound was the cause of death. There were no eyewitnesses to the incident, nor anyone who had seen Drake or any other individual at or near the scene near the time of death. No fingerprints were recovered from the scene, nor any weapon. No firearm linked to the event was ever recovered.

Detectives of the Chicago police department initially assigned to investigate the homicide spoke with Berry, her mother, and her son a few days after the incident and learned from them of the confrontations between the defendant, Berry, and Drake regarding her relationship with Drake. Although the officers attempted to locate the defendant to speak with him regarding the incident, they were unable to find

him. As a result, they left word at the home of his mother that they wished to speak with him. They also issued a stop order—an internal police notification to fellow officers that the individual is wanted for questioning.

On December 28, 1980, at roughly 3:30 p.m., defendant and a companion were arrested for shoplifting from a grocery store and taken to the Sixth District station. The defendant gave the name of "Oscar Williamson" and gave an incorrect date as his date of birth. He was charged with theft and fingerprinted. At roughly 10 p.m., officers of the Sixth District determined that his true identity was William Simpson and that he was wanted by Area 3 officers for questioning regarding the Drake homicide. The defendant was transported by Detectives Brankin and Moser of Area 3 to that station house at roughly 11:30 p.m. that evening. When the defendant inquired about the reasons for such transportation, the detectives told him he was wanted for questioning and advised him of his rights under *Miranda*.

Defendant was questioned regarding the homicide at approximately 9:30 a.m. the following morning. At that time, he was questioned by Detectives McWeeny and Higgins, who first advised him of his *Miranda* rights. According to the officers, the defendant voluntarily explained to them that he had shot Drake on October 29. The defendant specifically told them, in substance, the following sequence of events which culminated in Drake's death. Defendant stated that following his confrontation with Drake in the presence of Berry and her mother on October 16 or 17, he contacted Drake and arranged to meet with him at the corner of 71st Street and Stewart Avenue at 11 p.m. on October 29, 1980. At this encounter, the defendant again informed Drake that he wanted him to end his relationship with Berry. Drake responded that he had known Berry longer than the defendant had. The defendant stated that this was not important since Berry was his wife. Drake then asked whether the defendant was threatening him; the defendant responded that Drake could "take it any way he wanted to." Drake then turned away from the defendant and opened the door and reached into his van, next to which the two had been standing during the conversation. As Drake reached into the van, the defendant shot him in the back. The defendant then fled the scene. The defendant gave substantially the same explanation of his commission of the crime to Assistant State's Attorney Dane Cleven, to whom the defendant spoke later on the morning of December 30. The defendant refused to sign a written confession.

At the trial, defendant testified on his own behalf. He denied knowing whether Berry was having an affair, denied knowing Drake, denied

making any threats of harm to Drake, and denied confronting Drake about his relationship with Berry in the living room of Berry's apartment on October 16 or 17. He also maintained that he had not shot Drake but presented the alibi that he had been at his mother's house playing cards on the night in question.

Following a jury trial, defendant was found guilty of murder and sentenced to 32 years' imprisonment. His notice of appeal was timely filed.

### 1. Probable Cause

Defendant contends that the inculpatory statement he made to police during custodial interrogation should have been suppressed because there was no probable cause to arrest him for the homicide when the police arrested him for this crime by transporting him to the Area 3 station house. We disagree.

Probable cause exists in the objective sense if the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense. (*People v. Moody* (1983), 94 Ill. 2d 1, 7, 445 N.E.2d 275.) It is the function of the trial court to analyze the facts and circumstances known to the arresting officers at the time of the arrest in order to determine their sufficiency; a reviewing court will not disturb these findings unless they are manifestly erroneous. *People v. Free* (1983), 94 Ill. 2d 378, 401, 447 N.E.2d 218, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200.

The trial court, following a hearing at which Detective Higgins and the defendant testified, determined that the officers possessed probable cause to arrest the defendant for the homicide at the time he was transported to the Area 3 station house for questioning. The court took into account the officers' knowledge from discussions with the defendant's wife and family that the defendant had made threats of death or serious bodily harm to Drake on several prior occasions and their knowledge that the defendant had given a false name and birth date to the police when he was arrested for shoplifting. We cannot say that the trial court's determination, based upon this evidence, was manifestly erroneous.

Defendant places particular importance on the fact that the police had not obtained a warrant to arrest him but had only issued an internal police stop order. He contends that the officers drove him to Area 3 because of this stop order, not because they had probable cause to formally arrest him for the homicide, and that they therefore did not have

probable cause to effectuate an arrest. Whether the officers subjectively believed there was probable cause to arrest the defendant is irrelevant to a determination of whether the arrest was proper, however. The fourth amendment requires no more than "an objective inquiry into the reasonableness of a police officer's conduct based on the evidence he has." (*People v. Moody* (1983), 94 Ill. 2d 1, 9, 445 N.E.2d 275.) "The inquiry must focus on what was done and known by the police, not on what was believed, what the facts objectively viewed-add up to, not what the officer on the scene believed they added up to." (94 Ill. 2d 1, 10.) It was the province of the trial court to determine objectively whether there was probable cause to arrest the defendant, which it did here. As the trial court correctly concluded, the officers' reliance upon a police stop order was not dispositive of whether probable cause supported the defendant's arrest for homicide.

### 2. VOLUNTARINESS OF THE INCULPATORY STATEMENTS

██ █ Defendant claims that his inculpatory statement to police during custodial interrogation should have been suppressed as involuntary because he was undergoing heroin withdrawal at the time he made the statement. We do not agree.

At the suppression hearing, the defendant testified that he had injected himself with heroin at roughly 2 p.m. of the day on which he was arrested for shoplifting and transported to Area 3. He stated that during the night he was detained at Area 3 he developed the gross symptoms of withdrawal (nausea, vomiting), that the officers were aware of his condition, and that they promised to provide him with medical attention if he cooperated with them. During the early hours of the 30th, according to defendant, various officers attempted to question him on at least two separate occasions. The defendant stated that he finally agreed to speak with them on the morning of the 30th, when the third set of officers questioned him regarding the homicide. The defendant further stated that he also told the assistant State's Attorney who spoke with him at roughly 11:30 a.m. on December 30 that he was undergoing heroin withdrawal. A companion of the defendant who had been with him earlier on December 29 before the defendant and the companion were arrested for shoplifting also testified that she saw the defendant inject himself with heroin at roughly 2 p.m. on December 29, *i.e.,* approximately nine hours before he was driven to Area 3.

One of the officers who drove the defendant to Area 3, however, testified that the defendant said nothing to him to the effect that he was going through heroin withdrawal, and that he showed no symptoms of such withdrawal while in the officer's presence. The detectives

working at Area 3 during the night and early morning of December 30 also testified that the defendant said nothing to them about being a heroin addict or going through withdrawal, and that he showed no signs of suffering from withdrawal. Detectives McWeeny and Higgins, who questioned the defendant on the morning of December 30, gave substantially the same testimony as did Assistant State's Attorney Dane Cleven, who spoke with him later in the morning.

The trial court specifically found the testimony of defendant and that of his companion incredible, and, based upon the testimony of the State's witnesses, concluded that his inculpatory statements had been made voluntarily. A trial court's determination that the State's witnesses are more credible is to be set aside on review only if it is contrary to the manifest weight of the evidence. (*People v. Davis* (1983), 95 Ill. 2d 1, 25, 447 N.E.2d 353, *cert. denied* (1983), 464 U.S. 1001, 78 L. Ed. 2d 697, 104 S. Ct. 507; *People v. Aldridge* (1980), 79 Ill. 2d 87, 93, 402 N.E.2d 176.) On this basis, we cannot conclude that the trial court's determination was manifestly erroneous.

*People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508, *cert. denied* (1982), 455 U.S. 1024, 72 L. Ed. 2d 144, 102 S. Ct. 1726, upon which defendant relies, does not compel a contrary result; *Kincaid* does not adopt a *per se* rule that a confession induced by drugs is always inadmissible, as defendant contends. Rather, in *Kincaid* the court noted that "the fact that an accused is under the influence of drugs, self-administered or otherwise, when he makes a confession does not make the confession inadmissible automatically. It is still the province of the trial court to ascertain whether the accused's will was overborne at the time the confession was made." (87 Ill. 2d 107, 119.) Consequently, even assuming *arguendo* that the defendant was under the influence of heroin when he made inculpatory statements to the police, the trial court could have reasonably concluded that his will was not overcome thereby, and that his inculpatory statement was nonetheless voluntary.

### 3. MARITAL PRIVILEGE

■ Defendant contends that the trial court committed reversible error in admitting into evidence the testimony of defendant's mother-in-law regarding a conversation which she overheard between the defendant and his wife. We find no error.

Velma Lee, Berry's mother, testified that in August 1980, Drake drove up to the Berry residence while Lee was sitting on the porch, and she and Drake spoke for a while. When he drove away, Lee remained on the porch for roughly 15 to 20 minutes. She then went up-

stairs to the Berry apartment and into the living room. Berry's bedroom was located off the living room; Lee seated herself 15 to 20 feet from the bedroom. While there, she overheard a conversation between Berry and the defendant, who were both in the bedroom. Over objection, Lee testified that Berry told the defendant that there was nothing between her and Drake. The defendant replied to Berry that he would "get the nigger." Defendant argues that his conversation was protected by the marital privilege and should not have been admitted into evidence.

Section 6 of Division XIII of the Criminal Code of 1874 (Ill. Rev. Stat. 1981, ch. 38, par. 155—1) provides that although a husband and wife may testify for or against each other in criminal cases, "neither may testify as to any communication or admission made by either of them to the other or as to any conversation between them during marriage ***." Defendant concedes that this privilege does not apply where the confidential conversation takes place in the presence of a third party, and cites, *inter alia, People v. Simpson* (1977), 68 Ill. 2d 276, 369 N.E.2d 1248, as an example of this rule. But, defendant argues that this rule does not apply where the conversation is overheard by a third party. In support, defendant asserts that "although McCormick suggests that the marital 'privilege does not protect against the testimony of third persons who have overheard (either accidentally or by eavesdropping) an oral communication between husband and wife,' Illinois law does not seem to have adopted this approach. McCormick, Evidence sec. 82, at 167 (1972)."

In *Simpson*, however, the supreme court adopted in *dicta* the rule enunciated by McCormick and quoted by the defendant. The court stated:

> "Communications in the presence and hearing of a third party are generally not considered to be confidential communications within that privilege. (*People v. Palumbo* (1955), 5 Ill. 2d 409, 414-15.) It is likewise apparent that one in whose presence a communication between spouses is made may testify to that conversation, even though the witness overheard the conversation by eavesdropping. Similarly, one may testify who learns the contents of a written communication from one spouse to another by interception, or through loss or misdelivery by the custodian. McCormick, Evidence sec. 82, at 167 (2d ed. 1972)." (*People v. Simpson* (1977), 68 Ill. 2d 276, 280.)

Similarly, in E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 506.2, at 273 (4th ed. 1984), the authors state that "where the parties know that another person could easily with the naked ear hear

a communication, no privilege would attach, for an intent to have the communication be confidential is lacking." Further, we note the policy that privileges such as the one at issue here are to be strictly rather than broadly construed, as "evidentiary privileges of this sort exclude relevant evidence and thus work against the truthseeking function of legal proceedings." (*People v. Sanders* (1983), 99 Ill. 2d 262, 270, 457 N.E.2d 1241 (holding marital privilege inapplicable to communications between parents and their children).) Based on these precedents, we conclude that the trial court properly admitted Lee's testimony on the ground that it was not protected by the marital privilege.

### 4. Fair Trial

■■ Defendant argues that he was denied his right to a fair trial because of State's witnesses' references to his commission of other crimes and because of prejudicial statements and cross-examination of a defense witness by the prosecuting attorneys during the course of the trial. Defendant also claims that these errors cumulatively deprived him of a fair trial. We disagree.

First, defendant claims that certain testimony by Berry and her mother, Lee, referred to other crimes the defendant had allegedly committed and that the trial court's instructions to the jury to disregard these statements were insufficient to cure the error and provide the defendant with a fair trial. Berry testified that in August 1980 the defendant asked her, while they were in their bedroom, who the man outside the house was. She stated that when she told him she did not know, the defendant "got violent and pulled a knife out." Following a sidebar with counsel for both the State and the defense, the trial court struck the entire conversation from the record and instructed the jury to disregard the testimony. Later in the trial, Berry's mother, Lee, testified that she overheard a conversation between Berry and the defendant on one occasion. She stated, *inter alia,* that she heard Berry tell the defendant to stop hitting her. Defense counsel's objection was sustained and the jury told to disregard this testimony. Lee's testimony resumed, and she again stated that she heard Berry tell the defendant to stop hitting her. Defense counsel's objection was again sustained, and the jury told to disregard the statement. When Lee's testimony resumed for a third time, she again stated that she heard Berry tell the defendant to stop hitting her. Defense counsel's motion to disregard was again granted. Defendant asserts that this testimony by Berry and Lee was evidence of other crimes (battery and aggravated assault (Ill. Rev. Stat. 1981, ch. 38, pars. 12–2, 12–3)), which was irrelevant and prejudicial and suggested that he had a propensity to commit crime.

Defendant argues that the resulting prejudice could not be corrected by mere jury instructions, as evidence of his guilt was closely divided.

Although evidence of other crimes is generally inadmissible if relevant only to show the defendant's propensity to commit crime, such evidence is nevertheless admissible for a variety of other purposes and indeed is admissible "if it is relevant for any purpose other than to show the propensity to commit crime. [Citations.]" *(People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, *cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145.) Further, if evidence is improperly introduced, a trial court's prompt instruction to the jury to disregard such evidence cures any error in its introduction, unless the evidence can be said to be so highly prejudicial or inflammatory that a proper instruction could not have cured the error. *People v. Bartall* (1983), 98 Ill. 2d 294, 317, 456 N.E.2d 59.

The testimony of the defendant's wife, Berry, regarding their conversation was properly held inadmissible by the trial court because it was a privileged marital conversation. (See Ill. Rev. Stat. 1981, ch. 38, par. 155—1.) The trial court promptly instructed the jury to disregard the entire conversation, and we cannot say that this evidence was so highly prejudicial and inflammatory that the instructions did not cure the error.

The testimony of the defendant's mother-in-law, Lee, was not protected by the marital privilege, as we have already determined. The State claims that her testimony was properly admissible other-crimes evidence showing defendant's motive to commit the crime and his criminal intent. Because the trial court determined that the evidence was inadmissible, we do not reach the question of whether such testimony was indeed admissible, but instead conclude that error, if any, was sufficiently cured by the trial court's prompt instructions to the jury to disregard the testimony. We also note that Lee's statements were not responsive to the questions posed and were made contrary to the prosecuting attorney's specific instruction to the witness to refrain from revealing that portion of the conversation. See *People v. Kirkwood* (1959), 17 Ill. 2d 23, 31, 160 N.E.2d 766, *cert. denied* (1960), 363 U.S. 847, 4 L. Ed. 2d 1730, 80 S. Ct. 1623; *People v. Dunning* (1980), 88 Ill. App. 3d 706, 710, 410 N.E.2d 1052.

Defendant's assertions regarding impropriety because of statements by the prosecuting attorneys center around, first, suggestions that the defendant had engaged in prior criminal conduct, and second, prejudicial and inflammatory statements made during various stages of the trial.

Defendant contends that he was denied his right to a fair

trial where, even though the trial court sustained defense counsel's objections, the assistant State's Attorney twice suggested during cross-examination of a defense witness that the defendant had engaged in prior criminal activity by obtaining methadone through fraud or subterfuge. Specifically, defendant claims prejudicial error in the prosecuting attorney's cross-examination of Steven McGuire, director of the clinic where the defendant registered and obtained methadone. The prosecutor, during the course of cross-examination, asked McGuire whether a person wishing to obtain methadone had to sign an affidavit to the effect that he would not obtain methadone through subterfuge or fraud. Defense counsel's objection to the question was sustained before the witness began to answer the question. The prosecutor continued his cross-examination of the witness regarding forms and procedures at the clinic, and again asked the witness whether the clinic required a form for the methadone program which specified that the applicant would not use fraud, deception, deceit or subterfuge in order to obtain methadone. Defense counsel's objection to the question was again sustained before the witness answered the question.

Cross-examination which creates an innuendo unsupported by evidence is improper (*People v. Burbank* (1972), 53 Ill. 2d 261, 271, 291 N.E.2d 161, *cert. denied* (1973), 412 U.S. 951, 37 L. Ed. 2d 1004, 93 S. Ct. 3017), and constitutes reversible error because of its prejudicial effect where it substantially affects the jury's determination of a principal issue in the case. (See *People v. Green* (1983), 118 Ill. App. 3d 227, 235, 454 N.E.2d 792.) Although we do not condone the prosecuting attorney's method of cross-examination in this instance, a thorough review of the evidence presented to impeach the defendant's credibility indicates that this improper cross-examination did not have a substantial prejudicial impact on the jury's conclusion that he was guilty of the crime charged.

■■■ With regard to various other comments by the State's Attorneys during the course of the trial, defendant contends that during his opening statement, direct examination of Drake's sister-in-law, and in closing argument, the prosecutor improperly referred to the fact that Drake had lived with his invalid mother and retarded brother.

In *People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218, *cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 175, 104 S. Ct. 200, the Illinois Supreme Court recently reviewed the circumstances under which such prosecutorial references constitute reversible error and determined that references to evidence regarding a decedent's family are proper where the evidence is properly admitted, where references thereto are incidental rather than calculated, and where they are "not presented in

such a manner as to cause the jury to believe this fact to be material as to the defendant's guilt." 94 Ill. 2d 378, 415.

A review of the record in the case at bar establishes that the evidence presented regarding Drake's family background was properly admitted for the purpose of identification and that the State's references thereto were merely incidental rather than calculated to be inflammatory. (See *People v. Free* (1983), 94 Ill. 2d 378, 414-15.) We are unable to conclude, based on the record before us, that this evidence was presented in a manner designed to cause the jury to believe that it was material to the defendant's guilt. As a result, we find no error or prejudice in the State's introduction of and reference to this evidence.

Defendant also urges prejudicial error in the State's references during its opening statement and during the trial to the fact that the defendant was unemployed at the time of the alleged offense. We find no prejudicial error in admitting this evidence, since the defendant himself testified on direct examination that he was unemployed.

Defendant also claims error in certain other comments made by the State during its opening statement. First, he argues prejudicial error in the State's Attorney's statement, "We have a right to protect ourselves." Although defense counsel's objection to this remark was sustained, the prosecuting attorney then repeated the comment; defense counsel's objection thereto was again sustained and the jury instructed to disregard it. Second, defendant contends prejudicial error in the opening statement remark that "[t]hen on or about October 15th or 16th of 1980 Mrs. Berry in an attempt to I would say get out of the relationship of just in a—because she was frustrated, took an overdose of tablets and was taken to the hospital."

It is improper for the prosecutor to include remarks in his opening statement which are not later proved at trial or which express his own personal opinion as to the defendant's guilt; such improper comments are reversible error, however, only where there are reasonable grounds for believing that the jury was prejudiced by the improper remarks. (*People v. Whitlow* (1982), 89 Ill. 2d 322, 341, 433 N.E.2d 629, *cert. denied sub nom. Gibson v. Illinois,* 459 U.S. 830, 74 L. Ed. 2d 68, 103 S. Ct. 68; *People v. Lampton* (1982), 108 Ill. App. 3d 41, 45, 438 N.E.2d 915.) In the instant case, the prosecutor's remarks regarding a right to self-protection were promptly stricken by the trial court and the jury admonished to disregard the statement. Further, the statement regarding Berry's "attempted suicide" was incidental and ambiguous. Consequently, we are unable to conclude that the remarks prejudiced the jury in its determination of the defendant's guilt.

Defendant also urges prejudicial error in the State's re-

marks during closing argument. First, defendant claims that the prosecutor committed reversible error when he referred to a prior conviction of the defendant, offered for impeachment purposes, as substantive proof that the defendant was familiar with the legal system. Defense counsel's objection to the statement was sustained. The prosecutor then attempted to remark on the reasonable inferences that could be drawn from the defendant's conviction and incarceration in the penitentiary. Defense counsel's objection was again sustained. Although this comment was improper (see *People v. Bryant* (1983), 94 Ill. 2d 514, 522, 447 N.E.2d 301), we cannot say that it substantially prejudiced the defendant. Second, defendant claims error in the State's comment in closing argument that the defense failed to call certain witnesses. The record establishes that these comments were made in response to the defense's remarks in closing that the State had not called these witnesses to testify. A defendant cannot claim error where the prosecutor's remarks are in reply to and have been invited by defense counsel's argument. See *People v. Dixon* (1982), 91 Ill. 2d 346, 350-51, 438 N.E.2d 180.

Lastly, defendant argues that all of these errors, when accumulated, denied him a fair trial. Where the cumulative impact may be reasonably determined to have prejudiced the jury and constituted a material factor leading to the defendant's conviction, such errors constitute grounds for reversal. *People v. Whitlow* (1982), 89 Ill. 2d 322, 341, 433 N.E.2d 629.

In our view, based on the trial record as a whole, the errors committed at trial were not so prejudicial that it can be said that a fair-minded jury would have voted acquittal based upon the properly admitted evidence presented at the trial. Although we do not condone the improper conduct of the prosecuting attorneys, we are unable to conclude that their behavior was either extremely prejudicial or deliberately calculated to be inflammatory. We reach this conclusion because it is manifest here that the evidence establishing defendant's guilt was overwhelming.

### 5. JURY INSTRUCTIONS

Defendant argues that the trial court committed reversible error in its refusal to give defendant's tendered jury instructions on voluntary manslaughter based upon unreasonable belief in self-defense and sudden and intense passion resulting from serious provocation. Defendant claims that the testimony of two State's witnesses, Officer James Higgins and Assistant State's Attorney Dane Cleven, provided the evidence which would have supported such instructions. Both Hig-

gins and Cleven testified to the inculpatory statements of the defendant during custodial interrogation. Higgins stated that the defendant said that he met Drake at approximately 11 p.m. on October 29 to discuss Drake's involvement with the defendant's wife. According to Higgins, the defendant stated that he said to Drake:

> "You f-------- around with my wife and I don't want you doing that [; Drake said] *** listen I've known her longer than you have and [the defendant] said that doesn't matter you're f------ around with her and I want you to stop. [Drake] says are you threatening me and [the defendant] says you can take it any way you want and with this [Drake] turned around toward the van opened up the door and started to reach in and [the defendant] says I pulled my gun and shot him, shot him in the back. I didn't want to give him a chance ***."

Cleven's testimony of the defendant's statement was substantially similar, but he also stated that the defendant told him that Drake had not threatened him and that he did not see that Drake had a weapon. (No weapon was recovered from the scene or from the defendant.)

The defendant first argues that this testimony was sufficient to support a jury instruction for voluntary manslaughter based on unreasonable belief in self-defense. We disagree.

Voluntary manslaughter occurs where "a person *** intentionally or knowingly kills an individual [because] *** at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 *** but his belief is unreasonable." (Ill. Rev. Stat. 1981, ch. 38, par. 9—2(b).) An individual is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another or the commission of a forcible felony. (Ill. Rev. Stat. 1981, ch. 38, par. 7—1.) "[C]redible evidence in the record which would reduce murder to manslaughter entitles an accused to a manslaughter instruction." (*People v. Ward* (1984), 101 Ill. 2d 443, 451, 463 N.E.2d 696.) Such instructions are appropriate even if the facts on which the defense is based are inconsistent with the defendant's own testimony. (*People v. Brachter* (1976), 63 Ill. 2d 534, 540, 349 N.E.2d 31; *People v. Ishmael* (1984), 126 Ill. App. 3d 320, 326, 466 N.E.2d 1334.) Nevertheless, this slight credible evidence must be more than that which would permit a defendant to demand instructions based upon the merest factual reference or witness' comments. *People v. Brachter* (1976), 63 Ill. 2d 534, 540-41, 349 N.E.2d 31; *People v. Baggett* (1983), 115 Ill. App. 3d 924, 931, 450 N.E.2d 913.

██ Here, the trial court concluded that there was no evidence justifying a voluntary manslaughter instruction, and we cannot say that this conclusion was manifestly erroneous. The defendant's argument, in our view, is based upon the mere factual reference of Officer Higgins to Drake's movement away from the defendant in order to reach into his van. According to Cleven, however, the defendant stated that Drake did not threaten him and that he did not see that Drake had a weapon. Consequently, there was nothing in the testimony from which the jury reasonably could have concluded that the defendant subjectively believed at the time that Drake was about to commit an aggressive act or that the defendant subjectively believed the use of force was necessary for his own self-defense. As a result, there was insufficient evidence in the record to justify a voluntary manslaughter instruction based on a mistaken belief in self-defense.

 ██ Defendant also claims that the trial court should have given the jury a voluntary manslaughter instruction based on sudden and intense passion resulting from serious provocation. (See Ill. Rev. Stat. 1981, ch. 38, par. 9—2(a).) He argues that such passion resulted from his discovery that Drake was having an adulterous relationship with his wife, Berry. We disagree.

An instruction based on discovery-of-adultery provocation "has generally been limited to instances where the parties are discovered in the act of adultery or immediately before or after such act, and the killing immediately follows such discovery. [Citations.]" (*People v. Harris* (1983), 123 Ill. App. 3d 899, 904, 463 N.E.2d 1030.) This general rule has been the subject of exception in limited circumstances where "the revelation of adultery was but one of a series of statements or circumstances found by the courts to be so provoking as to constitute an exception to the general rule in Illinois that words alone cannot constitute sufficient provocation to reduce a murder to voluntary manslaughter." (123 Ill. App. 3d 899, 905.) Here, the facts do not establish that the defendant shot Drake immediately following discovery of the parties in an adulterous act. Nor do the facts indicate a series of exceptionally provoking statements or circumstances within the limited exception justifying a voluntary manslaughter instruction. As a result, we find no error in the trial court's refusal to give a voluntary manslaughter instruction based upon discovery-of-adultery provocation.

### 6. INEFFECTIVE ASSISTANCE OF COUNSEL

██ Defendant's contention of ineffective assistance of counsel is comprised of two arguments. First, defendant claims that it was reversible error for the trial court to deny him substitute counsel to ar-

gue his post-trial motion for a new trial based upon alleged errors of his trial counsel which amounted to incompetence of counsel. The defendant argued this motion before the trial court *pro se*; the court denied the motion. Second, defendant contends that his trial counsel's failure to call several alibi witnesses in his defense and two impeachment witnesses to rebut testimony of certain State's witnesses amounted to ineffective assistance of counsel. Because we conclude that the defendant is entitled to a new post-trial hearing where he will be represented by substitute counsel from other than the public defender's office to argue his claim of incompetence of trial counsel, we do not address the defendant's substantive claim.

In *People v. Krankel* (1984), 102 Ill. 2d 181, 464 N.E.2d 1045, the defendant argued that the trial court's refusal to appoint him substitute counsel to argue his post-trial motion alleging ineffective assistance of counsel was erroneous. The supreme court agreed that it was reversible error, but determined that the appropriate remedy was a new post-trial hearing on the issue, rather than a new trial. In light of *Krankel,* we remand the cause to the trial court for a new hearing on defendant's post-trial motion, wherein defendant will be represented by substitute counsel, and at which the trial court may determine whether "counsel's representation fell below an objective standard of reasonableness [such] that counsel's shortcomings were so serious as to 'deprive the defendant of a fair trial' *** [and that] 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*People v. Albanese* (1984), 104 Ill. 2d 504, 525.) If the trial court determines upon rehearing that defendant was deprived of effective assistance of counsel, the defendant should be afforded a new trial. If, however, the trial court determines that defendant was not denied effective assistance of counsel it should deny a new trial and leave standing defendant's conviction and sentence for murder.

For the reasons stated, the cause is remanded for a new post-trial hearing on defendant's allegation of ineffective assistance of trial counsel.

Remanded for new post-trial hearing.

LINN, P.J., and JIGANTI, J., concur.