UNITED STATES of America ex rel. William SIMPSON, Petitioner,

v.

Michael NEAL, Respondent.

No. 89 C 3278.

United States District Court, N.D. Illinois, E.D.

Sept. 4, 1990.

Standish E. Willis, Chicago, Ill., for petitioner.

Richard S. London, Asst. Atty. Gen., Chicago, Ill., for respondent.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

William Simpson ("Simpson") has filed a petition for writ of habeas corpus (the "Pe-

tition") under 28 U.S.C. § 2254 ("Section 2254") against Danville Correctional Center Warden Michael Neal ("Neal") challenging Simpson's 1982 murder conviction. After this Court found as a threshold matter that the Petition stated claims potentially justifying habeas relief and therefore appointed counsel to represent Simpson, Neal filed his answer to the Petition. Further briefing by both sides has made the case ripe for decision. For the reasons stated in this memorandum opinion and order, Simpson's Petition is denied and this action is dismissed.

## Facts

After a jury trial in an Illinois Circuit Court, Simpson was convicted of murdering William Drake ("Drake") and sentenced to 32 years in prison. Drake had been found lying in the street on October 29, 1980 [1], dead of a gunshot wound to the lower back. No one had witnessed the shooting or had seen anyone (including Drake) near the scene at the time of the shooting. Police were unable to find any fingerprints at the scene, and the murder weapon was never recovered.

Not long after the shooting, investigators from Chicago Police Department Area 3 spoke to Simpson's wife Tecumseh Berry ("Berry"), her mother Velma Lee ("Lee") and Berry's son about the shooting and some confrontations between Simpson on the one hand and Berry and Drake on the other—matters about which the police had been informed. Testimony at trial revealed that Berry and Simpson had been married on August 7, 1979 while Simpson was in prison. Upon his release in August 1980 Simpson moved in with Berry, who was living with her mother and son. At some point—whether before or after the marriage or his release from prison is unclear—Simpson got wind of the fact that Berry had been having an affair with Drake, whom Berry had known for 16 or 17 years. In spite of Berry's insistence that the affair with Drake had ended when Simpson was released, Simpson suspected that the relationship had continued and an-

grily confronted Berry about Drake on several occasions. Evidence was presented at trial that Simpson had become violent during at least one of those confrontations, had threatened Berry with a knife and had threatened to "get" Drake.

About two weeks before Drake's death, Simpson and Berry were considering divorce. When Simpson entered Berry's mother's home on October 16 or 17 to retrieve his belongings and move out he came upon Berry, Lee and Drake talking in the living room. In spite of the state of his own relationship with Berry, Simpson crudely told Drake to terminate his relationship with Berry. When Drake suggested that they discuss the matter out of the others' presence, Simpson responded that he would "see you later" and left to gather his possessions. That was their last known meeting before Drake's death.

Detective Nick Crescenzo ("Crescenzo") was one of the initial investigators assigned to the Drake homicide. After hearing that story, Crescenzo and other investigators tried to locate Simpson for questioning. When they failed to find him they issued a stop order so that other officers would know that Simpson was wanted for questioning in case he was later located. That occurred at about 3:30 p.m. on December 28 when Simpson and a companion were arrested for shoplifting. Simpson was taken to the Sixth District (Area 2) Police Station, charged with theft and fingerprinted. When asked to identify himself, he gave the name "Oscar Williamson" and lied about his birth date. At about 10 p.m. the officers holding Simpson uncovered his true identity and the stop order issued by the Area 3 investigators. Police and Simpson tell widely divergent stories about what happened next.

According to police witnesses, at about 11:30 p.m. Area 3 Detectives William Moser ("Moser") and Thomas Brankin ("Brankin") arrived at the Sixth District to take Simpson back to the Area 3 station house. When Simpson asked why he was being moved, the detectives told him he was wanted for questioning and gave him the

---

**1.** All further dates without year designations will refer to occurrences during 1980.

*Miranda*-prescribed advice of rights (R.27–29, 56, 69).[2] Simpson made no statement at that time. Sometime between midnight and 1 a.m. the next morning (December 29) Simpson was taken to the interview room in the Area 3 station house and was left handcuffed to a ring in the wall.[3] Although Crescenzo was working the midnight to 8 a.m. shift on December 29, he testified to having been too busy with other matters to question Simpson.[4] He testified that he looked in on Simpson twice during the night and, finding Simpson asleep across two chairs, did not disturb him (R.446–47, 449).

Detectives did not begin questioning Simpson until 9:30 a.m. December 29. When Detectives McWeeny and James Higgins ("Higgins") arrived for the morning shift at 8:30 a.m. that day, they reviewed the police reports relating to the investigation of Drake's death and spoke with Crescenzo about the information that had been gathered linking Simpson to that death (R.87–99, 450–52). Crescenzo told McWeeny and Higgins of his interviews with Barry and Barry's mother and son about Simpson's threats against Drake. As it was the end of his shift, Crescenzo then left.

McWeeny and Higgins testified that Simpson was still asleep when they entered the interrogation room. They woke him up and took him to the washroom, and almost immediately after they again advised Simpson of his *Miranda* rights he voluntar-ily confessed to killing Drake (R.101–06). Simpson allegedly explained to the officers that after the October 16 or 17 confrontation he arranged to meet Drake at 11 p.m. October 29 at the streetcorner where Drake's body was found. When Simpson again insisted that Drake stop seeing Berry, Drake responded that he had known Berry longer than Simpson had. Unpersuaded, Simpson reminded Drake that Berry was his wife. When Drake asked if he should take that as a threat, Simpson told him to "take it any way he wanted to." Finally, Simpson told the detectives that he shot Drake in the back when Drake turned to reach into the door of his van. Simpson then fled.

After hearing that story, McWeeny and Higgins called for an Assistant State's Attorney to take Simpson's statement (R.107). Assistant State's Attorney Dane Cleven ("Cleven") arrived between noon and 1 p.m. and again interviewed Simpson without McWeeny and Higgins present. Simpson told Cleven the same story as before but refused to sign a written confession.

Simpson's description of post-arrest events was very different. Simpson and the person he was with when he was arrested for shoplifting, Zelda Stanley ("Stanley"), testified that Simpson had injected himself with a "speed ball"—a mixture of heroin and cocaine—about an hour and a half before their December 28 arrest (R.284–85, 462–63). Simpson further testified that he had a $150 to $300 per day

---

**2.** Because the state court record in this case comprises several parts, it would be helpful to create a shorthand for referring to record citations. This opinion will employ:

1. "R.—" to refer to pages of the trial record—which contains the entire trial transcript and the second day (February 4, 1982) of the initial post-trial hearing on Simpson's motion for a new trial;
2. "Supp.R.I—" to refer to the first Supplement to the record, which contains the transcripts of the July 8, 1981 hearing on Simpson's motion for appointment of new counsel and the November 6, 1981 arguments on Simpson's motion to suppress;
3. "Supp.R.II—" to refer to the second Supplement to the record, which contains the transcript of the witness testimony relating to Simpson's motion to suppress and the first day (February 3, 1982) of the initial post-tri-al hearing on Simpson's motion for a new trial;
4. "Supp.R.III—" to refer to the third Supplement to the record, which contains the transcript of Simpson's October 28, 1985 offer of proof at the second post-trial hearing on ineffective assistance of counsel; and
5. "Supp.R.IV—" to refer to the fourth Supplement to the record, which contains the transcript of the remainder of the second post-trial hearing on ineffective assistance of counsel.

**3.** Detective Daniel McWeeny ("McWeeny") testified that the Area 3 station house had no "lock-up" for suspects awaiting questioning on violent crimes.

**4.** Crescenzo testified that only one other detective—John Boyle—was on duty that night.

heroin habit (R.290) and was enrolled in a substance abuse program where he received methadone treatments (R.286–90). Simpson testified that he informed police of his need for methadone but was told he would not receive any help until he confessed to killing Drake.[5]

In support of his claim to having undergone heroin withdrawal, Simpson called Steven McGuire ("McGuire"), clinical director of the Community Health Program where Simpson had received drug rehabilitation treatment, who testified that a heroin addict such as Simpson would begin to experience symptoms of withdrawal about four to eight hours after his last fix, with the symptoms becoming worse with time so that 16 to 24 hours after last taking heroin he would have an elevated heart rate, would be perspiring, jittery and nervous, and would become nauseated, vomit and experience diarrhea (R.418). Simpson testified to experiencing all these symptoms—plus hot and cold flashes—during questioning (R.310–11, 314–15). Simpson's sister testified that she saw Simpson at that time and that he appeared to need his methadone treatment (R.257, 262). Stanley, who was with Simpson's sister, also said that Simpson "was sweating and shaky and he had a quiver in his voice" (R.471).

Simpson also claims that Moser and Brankin interrogated him almost continuously "from 10:30 p.m. to dawn" (P.Mem. 3) on the night of December 28–29. During that interrogation, Simpson claims:

Investigator Moser falsely told Petitioner that he had witnesses that could place him at the scene of the crime on the night of the shooting. Investigators Moser and Brankin told Petitioner that he could give a statement of self-defense consistent with the witnesses' statements. After Petitioner refused to make any statements he was slapped, his eye-

glasses flew off of his face and broke, he was strip-searched and Inspector Moser threatened that he would remain handcuffed to the wall until he was ready to cooperate with them.

Simpson further testified that Brankin took from Simpson a phone book that contained a card with Simpson's lawyer's phone number. Simpson testified that he asked for the book back and was refused. When he then requested that his lawyer be present during questioning and asked for his lawyer's phone number from the card, Moser and Brankin again refused and continued the questioning (R.295–96, 370–71). Moser and Brankin deny ever questioning Simpson, let alone threatening him or striking him. They further testified that Simpson never asked to see a lawyer and denied having taken a phone book from him (R.31–33, 46–47, 58–59, 70–73).

Similarly, although Crescenzo testified that he was too busy to do more than look in on Simpson while he slept, Simpson claims Crescenzo continued the grilling begun by Moser and Brankin (P.Mem. 3):

Petitioner had been left alone and handcuffed to the wall for two hours when Detective Crecenzo [sic] continued the interrogation of Petitioner on December 29, 1980. He asked if Petitioner was ready to give a statement and upon Petitioner's refusal again left him handcuffed to the wall coming in periodically to inquire as to whether Petitioner would talk. Petitioner repeatedly asked to speak with an attorney and to use the restroom. His requests were denied.

Simpson testified that at that point—approximately 6 a.m.—Crescenzo drove Simpson back to the Sixth District. According to Simpson he was kept there only about fifteen minutes before Crescenzo again loaded him back into a car and re-

---

5. Simpson specifically testified to having informed the lock-up keeper at the Sixth District (R.390) and Moser and Brankin (R.290, 360) and McWeeny (R.315–16) about his having taken drugs and his need for methadone, and also said he had told Cleven of his withdrawal symptoms (R.388–90). On cross-examination Simpson said this about how Moser found out about his recent drug use (R.360):

Q. What did Moser say after he slapped you?
A. Asked me when's the last time I had taken some drugs.
Q. Had you told him up to that point and time you had taken drugs?
A. No.
Q. He asked you out of the clear blue sky?
A. Yes.

turned him to the interview room at Area 3 (R.305–06). At that point P.Mem. 3–4 picks up with the rest of Simpson's testimony:

At approximately 8:30 a.m. on December 29, 1980 petitioner was unhandcuffed and allowed by Detectives McWeeny and Higgins to use the restroom, after which he was taken to a different room and again handcuffed to the wall. The detectives attempted to convince Petitioner to offer a statement of self-defense. Petitioner was ill with withdrawal symptoms [6] and had not eaten or drank [sic] anything since his initial arrest. Petitioner informed the detectives of his addiction and requested methadone. Detective McWeeny promised Petitioner that he would be taken to a nearby hospital for his methadone treatment as soon as he gave the self-defense statement. After futilely requesting an attorney and attempting to complain to the Assistant State's Attorney regarding the police officers' conduct, it was then that Petitioner, still handcuffed to the wall, exhausted, sick and desperate, agreed to make any statement necessary in order to receive his methadone treatment. Petitioner then gave an oral statement which he knew to be false and therefore refused to sign any writings.

Simpson claims that the detectives questioned him for hours before Cleven finally gave him a *Miranda* warning, that he never made a statement to McWeeny and Higgins (R.379) and that his statement to Cleven (1) was the fruit of an illegal arrest because police lacked probable cause to arrest him for the Drake homicide and (2) was given involuntarily due to police misconduct. At the suppression hearing Moser, Brankin, McWeeny, Higgins and Cleven all claimed Simpson never told them of any withdrawal symptoms, nor were any symptoms evident. In addition, they all deny having struck him, having denied him an opportunity to speak to a lawyer or having pressured him in any way to confess to killing Drake (R.104–06).

That swearing contest was resolved when the trial court explicitly found the testimony of Simpson, his sister and Stanley incredible and that of the officers credible (Supp.R.II 40–41):

I simply do not believe that Dane Cleven went into that room with a waste paper basket, apparently into which the defendant had vomited by his testimony seven times, and no one made notice of it. I do not believe that the defendant said to him that he wanted a lawyer and the Assistant State's Attorney made no note of it. I do not believe that Dane Cleven would have lied in that matter so in this instance for the purposes of this motion I resolve the issue of credibility in favor of the prosecution. I do not believe that the defendant was struc[k] during the interrogation. I do not believe that he refused to answer questions or that he asked for a lawyer at any point.

On that basis the trial court denied Simpson's motion to suppress his confessions, and the jury later convicted.

Before the sentencing Simpson's trial attorney moved for a new trial on all the grounds now asserted for habeas relief except ineffective assistance of counsel, and Simpson presented his own pro se motion for new trial based on the claimed ineffectiveness of his trial counsel (Supp.R.II 487–501, R.844–55). All those motions were denied by the trial court.

On appeal that denial was upheld as to all the grounds for a new trial except the ineffective assistance of counsel, as to which the Appellate Court ordered a new hearing and the appointment of new counsel to help Simpson present his case for ineffective assistance (*People v. Simpson*, 129 Ill.App.3d 822, 84 Ill.Dec. 949, 473 N.E.2d 350 (1st Dist.1984)). At that second hearing the trial court again denied Simpson's ineffective assistance challenge (see generally Supp.R.III and Supp.R.IV). That denial was upheld on appeal (*People v. Simpson*, No. 85–424, slip op. (1st Dist. 1987)), and the Illinois Supreme Court denied leave to appeal further.

---

**6.** [Footnote by this Court] Simpson testified (R.315) that he vomited about five or seven

(R.380) times into a waste paper basket in the interview room during questioning.

## Probable Cause

■ Simpson first argues that police lacked the probable cause required by the Fourth Amendment[7] to arrest him for Drake's murder when they transported him to the Area 3 station house. As a result he claims that any confessions made there are fruits of that illegal arrest and should have been suppressed under the exclusionary rule of such cases as *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) and *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Neal confronts Simpson's challenge head-on by insisting that the detectives' conversations with members of Simpson's family, Simpson's threats against Drake and the fact of his having given a false name and birth date upon his arrest for shoplifting established probable cause for an arrest on suspicion of murder.

This Court need not decide who has the better of that dispute. It is well established that neither the fact that a conviction followed an illegal arrest (*United States v. Crews*, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980)) nor the fact that it was based on evidence obtained pursuant to an illegal arrest (*Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976))[8] provides grounds for federal habeas corpus relief. Under *Stone*, even if Simpson's arrest had been illegal, even if his confessions were "fruits" of that arrest and even if the state court should have applied the exclusionary rule to keep those confessions from the jury (428 U.S. at 494, 96 S.Ct. at 3052 (footnotes omitted)):

> where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

That result flows from *Stone*'s holding that the exclusionary rule's primary purpose, deterrence of police misconduct, must be balanced against society's substantial interest in bringing to justice those whose criminal culpability is established by evidence whose reliability is not contested. In balancing those interests *Stone* determined that while the illegality of a seizure does not diminish the reliability of resulting confessions and therefore the state's interest in sustaining the conviction remains high, on the other side of the balance the chance that police would be deterred from acting unconstitutionally by the possibility of reversal in a federal habeas corpus proceeding becomes vanishingly small. Rather than inflicting a heavy toll on state prosecutions for what was perceived as a small return, *Stone* simply removed redundant Fourth Amendment challenges from the scope of habeas corpus review.

*Stone, id.* at 494 n. 36, 96 S.Ct. at 3052 n. 36 refers to *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) on the question whether the state provided an opportunity for full and fair litigation. *Townsend, id.* at 316, 83 S.Ct. at 759 said this about the "full and fair hearing" standard:

> Even if all the relevant facts were presented in the state-court hearing, it may be that the fact-finding procedure there employed was not adequate for reaching reasonably correct results. If the state trial judge has made serious procedural errors (respecting the claim pressed in federal habeas) in such things as the burden of proof, a federal hearing is required. Even where the procedure employed does not violate the Constitution, if it appears to be seriously inadequate for the ascertainment of the truth, it is the federal judge's duty to disregard the state findings and take evidence anew. Of course, there are procedural errors so grave as to require an appropri-

---

7. As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the several underlying Bill of Rights provisions (which of course impose limitations only on the federal government) rather than to the Fourteenth

Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

8. For the reason stated in the text those "facts" may be assumed purely arguendo.

ate order directing the habeas applicant's release unless the State grants a new trial forthwith. Our present concern is with errors which, although less serious, are nevertheless grave enough to deprive the state evidentiary hearing of its adequacy as a means of finally determining facts upon which constitutional rights depend.

Here Simpson has not questioned the procedures used at the suppression hearing, and the record reveals no inadequacy either in that hearing or in the Illinois Appellate Court's review of the Circuit Court's decision. Both tribunals (1) reviewed the evidence presented at the hearing, (2) applied the proper rule of law (*People v. Moody*, 94 Ill.2d 1, 9, 67 Ill.Dec. 795, 799, 445 N.E.2d 275, 279 (1983) ("an objective inquiry into the reasonableness of a police officer's conduct based on the evidence he has")) and (3) made findings summarized this way by the Appellate Court (129 Ill.App.3d at 830, 84 Ill.Dec. at 950, 473 N.E.2d at 356):

> The trial court, following a hearing at which Detective Higgins and the defendant testified, determined that the officers possessed probable cause to arrest the defendant for the homicide at the time he was transported to the Area 3 stationhouse for questioning. The court took into account the officers' knowledge from discussions with the defendant's wife and family that the defendant had made threats of death or serious bodily harm to Drake on several prior occasions and their knowledge that the defendant had given a false name and birthdate to the police when he was arrested for shoplifting.

Thus even if this Court were to believe that the state courts had applied the exclusionary rule incorrectly, their decisions "are not subject to collateral review merely because the federal courts would decide the issue differently" (*United States ex rel. Maxey v. Morris*, 591 F.2d 386, 389 (7th Cir.1979)). Simpson's Fourth Amendment challenge must fail.

### Voluntariness

Simpson claims that his confessions on December 30 were not voluntary because (1) he was undergoing heroin withdrawal during questioning and (2) his will was overborne by the actions of police officers during the interrogation. At the suppression hearing the trial court unambiguously found Simpson's testimony incredible, and that determination was upheld on appeal (129 Ill.App.3d at 832, 84 Ill.Dec. at 951, 473 N.E.2d at 357).

That credibility determination controls here. Other than Simpson's own contrary testimony, there is no reason to question the wholly consistent testimony of the police witnesses. And *Marshall v. Lonberger*, 459 U.S. 422, 434–35, 103 S.Ct. 843, 850–51, 74 L.Ed.2d 646 (1983) teaches that this Court should give state court credibility determinations the same kind of deference that our Court of Appeals would give a similar determination by this Court after it had observed the witnesses' demeanor. On that score *Marshall* aptly quotes *Boyd v. Boyd*, 252 N.Y. 422, 429, 169 N.E. 632, 634 (1930) as later quoted in *United States v. Oregon Medical Society*, 343 U.S. 326, 339, 72 S.Ct. 690, 698–99, 96 L.Ed. 978 (1952):

> Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth.... How can we say the judge is wrong? We never saw the witnesses.... To the sophistication and sagacity of the trial judge the law confides the duty of appraisal.

This Court is in no position to treat with Simpson's mere assertion that the trial court erred in assessing the witnesses' demeanor. That being true, and because Simpson has presented no other basis to quarrel with the state court finding of voluntariness, his current challenge must fail as well.

### Ineffective Assistance of Counsel

Simpson's third ground for habeas corpus relief is that the performance of his

appointed trial counsel fell below the standard of reasonable effectiveness set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In particular Simpson claims that his trial counsel Robert Cooney ("Cooney") failed to elicit testimony at trial from witnesses who could have established Simpson's innocence. First, Simpson faults Cooney for not calling seven potential alibi witnesses whom Simpson had identified to Cooney well before trial. According to Simpson those seven would have testified that Simpson could not have committed the Drake homicide because at that time Simpson was playing cards at another location with those witnesses. In addition, Simpson claims that Cooney should have called four other witnesses to impeach various aspects of the testimony of Berry, Velma Lee and Berry's son.

Under the two-pronged *Strickland* test for evaluating ineffective assistance of counsel claims, Simpson must show both that his counsel's performance fell below an objective standard of reasonableness and that his counsel's errors materially prejudiced his ability to obtain a fair trial. This opinion will therefore turn to each of the claimed attorney errors with that dual standard in mind.

*1. Alibi Witnesses.*

■ Simpson claims that he asked Cooney to assert at trial an alibi defense and to that end provided Cooney with the names, addresses and phone numbers (where available) of seven individuals with whom Simpson claims he was playing cards on the night of the murder. Cooney, however, did not argue Simpson's alibi. Now Simpson charges Cooney with two errors in that regard:

1. failure adequately to investigate Simpson's alibi and

2. failure to exercise reasonable professional judgment in deciding (a) to ground Simpson's defense at trial solely on the challenge to Simpson's confessions and (b) not to pursue an alibi defense in addition.

Simpson moved in the trial court for post-trial relief predicated on his ineffective assistance claim. After the initial remand Simpson's new counsel attempted to obtain the attendance at the hearing on that motion of all potential witnesses that Simpson claimed could have aided in his defense. When none of the witnesses showed up to testify, Simpson's counsel instead made an offer of proof as to what he expected those witnesses would have said.

Leonard Thompson was expected to testify that on the night of Drake's murder he took part in a card game in a home at 8822 South Justine. Thompson was expected to say that Simpson was at the same card game when Thompson arrived at about 12:30 a.m. and was still there when Thompson left at 2 a.m. According to Simpson, Thompson was never spoken to by Cooney or any of Cooney's trial staff about Simpson's trial or claimed alibi.

Rosemary Simpson was expected to testify that she was also at the card game and that Simpson was at the game from 8 p.m. until approximately 1 a.m. She was also expected to say that neither Cooney nor his staff ever asked her to testify on Simpson's behalf although she was willing to do so.

Zelda Stanley, who did in fact testify at trial on Simpson's behalf, was also expected to testify to being at the card game from about 8 p.m. until 1 a.m. and to seeing Simpson there during those hours. Stanley was also expected to testify that she told Cooney about Simpson's presence there, but that Cooney failed to ask her at trial about the game or Simpson's presence.

Gwendolyn Simpson and Janet Simpson were also claimed to have been at the game between 8 p.m. and 1 a.m. and to have seen Simpson there during those hours. Both were also said to have told Cooney about the game, and both were present in court during the trial but neither was called to the witness stand. Gwendolyn Simpson was expected to testify further that the last she heard from Cooney was when he told her that she had to be excluded from the courtroom.

Darlene Dawson was expected to testify that she was also at the game from 8 p.m.

until 1 a.m. and that she told Janet Simpson that she had seen Simpson there during those hours. Again she was expected to testify that neither Cooney nor his staff had ever spoken to her.

Finally, Jean Revolus was expected to testify that Simpson was present at 8822 South Justine from 4:30 p.m. until 1 a.m. Revolus too was expected to say that he was never spoken to either by Cooney or his staff.

Cooney testified at the post-trial hearing that he received Simpson's list of potential witnesses and attempted to reach each of them in three ways: by mail, by investigator-delivered subpoena and by phone where phone numbers were available. In spite of those efforts Cooney was unable to locate a number of the witnesses Simpson had identified. Of the seven mentioned in Simpson's offer of proof, however, Cooney was unable to reach only Leonard Thompson.

Cooney's notes indicated that Simpson had given him several names in addition to those seven, most of whom were unavailable. Maria Price was served with a subpoena left with someone at her home, but Cooney was unable to reach her personally. When the person answering the door at the address Simpson gave for Lenmell Chandler refused service the investigators left the subpoena in the mail box, but Cooney was again unable to make personal contact with that witness. And finally Cooney attempted to serve Kitty Johnson, but the investigators who went to her home were told that she had moved to Jamaica.

Cooney further testified that several of the potential alibi witnesses that he *could* reach were really not helpful because they either could not recall the night in question or were not at the card game Simpson described at the time Drake was murdered, so they could not attest to Simpson's whereabouts at the relevant time. In particular, although Simpson's counsel made an offer of proof that Darlene Dawson was expected to testify that Cooney never reached her, Cooney testified that he wrote her a letter, had an investigator serve a subpoena on her and in fact spoke to her in

person. Cooney further testified that Ms. Dawson told him then that she did not know where Simpson was at the time of the murder. Similarly, although Simpson claimed that Cooney failed to speak to Jean Revolus, Cooney testified that they had a conversation in which Revolus told Cooney that he did not arrive at the card game until an hour after the murder occurred and had no knowledge of Simpson's whereabouts at that time.

Cooney related a similar story about two other potential witnesses whose names Simpson had given him but were not now among the seven who were the subject of Simpson's offer of proof. Denise Moody told Cooney that she had left the card game approximately 25 minutes before the murder. In addition, although he did not describe her potential testimony in detail, Cooney said that Valerie Mays was "no help" and that in his opinion her testimony would have been "counterproductive" (Supp.R.IV 27).

Finally, Cooney gave this explanation of his decision not to present to the jury testimony by those potential alibi witnesses whom Cooney was able to reach and who had told Cooney that Simpson was present at the card game on the fatal night (Supp. R.IV 16):

> Primarily, that many of the people that I talked to who were alleged alibi witnesses had no memory as to Mr. Simpson's whereabouts at the time and there were other, I suppose, tactical considerations that were also involved in our decision not to proceed with alibi witnesses at trial.

According to Cooney, he was in continual contact with Simpson prior to and throughout the trial. He said that he kept Simpson abreast of the information he was gaining from witnesses and of his decision not to use the alibi defense—as well as all other trial strategy choices—and that it was not Cooney's understanding that Simpson had desired to put on the alibi witnesses despite Cooney's professional judgment that the alibi defense should not be presented.

As an initial matter, to the extent that this issue turns on the weight to be given

to the conflicting testimony of Cooney and Simpson as the post-trial hearing, it is again appropriate to give deference to the trial court's credibility determinations. Indeed, whenever the issue is the effectiveness of trial counsel it should be remembered that only the trial judge occupies the commanding vantage point of having viewed counsel's performance throughout the trial—performance that is obviously relevant to whether counsel's actions in a single instance constituted such egregious error as to have deprived Simpson of his Sixth Amendment right to counsel. On that score the trial judge said (Supp.R.IV 44):

> I think it is appropriate and here the finding of this Court should actually be not that Mr. Cooney's efforts on behalf of his client satisfied the minimal standard announced in the opinion but satisfied a far higher standard; and that after he has been subject to the unpleasant attack on his professional conduct and is found that that attack is unwarranted, it is appropriate for this Court to make the observation not only did Mr. Cooney's conduct satisfy the standard announced in [*People v. Simpson,* 129 Ill.App.3d 822, 84 Ill.Dec. 949, 473 N.E.2d 350 (1984)] but that it went far beyond that, satisfied that standard which we should, as professionals, all seek.

In addition, *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066 teaches that this Court is to give similar deference to the tactical decisions of trial counsel himself:

> [T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

On the current record, however, it is hardly necessary for this Court thus to rely on deferential review and presumed adequacy. Even as an independent matter it would reach the same conclusion as the trial court as to Cooney's able representation. While it is true that defense counsel owes a duty to make reasonable investigations into all potential avenues of defense (*Strickland, id.* at 690–91, 104 S.Ct. at 2065–66), Simpson has failed to demonstrate that Cooney's attempts in any way fell short of the mark.

Simpson's current counsel suggests that Cooney could easily have located Kitty Johnson at her job with the Cook County Department of Corrections next door to the Criminal Court, but did not do so. That argument suffers from two flaws. First, there is no record evidence that Kitty Johnson actually could have been located. Simpson's current argument rests solely on the unsubstantiated assertion by counsel representing Simpson at the post-trial hearing that Ms. Johnson was so employed at the time (see Supp.R.IV 32–33).[9] If that witness was so easy to locate, it is fair to ask why Simpson's new attorney at the post-trial hearing failed to include her expected testimony in his offer of proof. And that raises the second, and fatal, problem with Simpson's claim that Cooney erred in not contacting Kitty Johnson. By failing to offer Ms. Johnson's testimony on the subject, Simpson has asked this Court to speculate on what that testimony might be. In dealing with challenges to trial counsel's investigatory efforts, our Court of Appeals has recently reaffirmed (*United States ex rel. McCall v. O'Grady,* 908 F.2d 170, 173 (7th Cir.1990)) its earlier statement in *United States ex rel. Cross v. DeRobertis,* 811 F.2d 1008, 1016 (7th Cir.1987):

> When the allegation of the ineffectiveness of counsel centers on a supposed failure to investigate, we cannot see how, especially in the context of a habeas proceeding that collaterally attacks the state court conviction, the petitioner's obligation can be met without a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such informa-

---

**9.** P.Mem. 17 tries to shift the burden to the state to prove that efforts to find Kitty Johnson "would have been fruitless." Under *Strickland* and its progeny, however, the burden remains on the petitioner to establish the ineffectiveness of counsel's assistance (see, e.g., *United States v. Slaughter,* 900 F.2d 1119, 1124 (7th Cir.1990)).

tion, assuming its admissibility in court, would have produced a different result.

Simpson has simply failed to make such a showing, or even to suggest that such a showing would be possible. Indeed, Simpson's inability to compel testimony of the purported alibi witnesses at the post-trial hearing seriously undercuts Simpson's claims that Cooney's similar failure resulted from insufficient zeal.[10]

Nor is it appropriate for Simpson to draw, from the fact that Gwendolyn Simpson was at trial and was excluded as a potential witness but was never called, the inference that Cooney simply forgot to call her as an alibi witness. Contrary to Simpson's allegations of negligence, Cooney testified unambiguously that he was aware of Gwendolyn Simpson's presence in court and that he told her she would be excluded as a potential witness, but that he made a tactical decision not to call any of the alibi witnesses. Nothing that Simpson has presented to this Court has convinced it that the investigation Cooney did was insufficient.

That brings us to Simpson's second major challenge to Cooney's performance: that Cooney failed to exercise reasonable professional judgment in deciding not to present the alibi defense. Of that kind of challenge *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066 said that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." More graphically, our Court of Appeals has spoken in these terms of the "high hurdle" that habeas petitioners must overleap to make out ineffective assistance claims (*Sullivan v. Fairman*, 819 F.2d 1382, 1391 (7th Cir. 1987)):

> Indeed, we expect that few petitioners will be able to pass through the "eye of the needle" [5] created by *Strickland.*

[5] Matthew 19:24

Here Simpson's camel has been unable to pass through that eye.

Given the limitations on the alibi witness testimony that Cooney expected to be able to elicit at best, his decision not to present that testimony to the jury is manifestly reasonable. It must be remembered that Simpson's alibi would be unlikely to be convincing to the jury unless the jury had first discounted Simpson's confessions to the police. But the success of Simpson's challenge to those confessions rested solely on the jury's finding that Simpson's description of the post-arrest events was more credible than the story told by all the police officers involved and the Assistant State's Attorney. Cooney would thus have undoubtedly viewed any challenge to Simpson's credibility—including the dim view that a jury might take of an attempt to present a weak alibi with conflicting testimony from witnesses whose demeanor Cooney considered unconvincing—as potentially disastrous to Simpson's overall defense. And that is precisely the kind of decision that trial counsel, in consultation with his client, is entitled to make.

*2. Impeachment Witnesses.*

 In addition to the alibi witnesses, Simpson faults Cooney for not presenting to the jury some impeachment testimony (1) demonstrating Velma Lee's bias against Simpson and (2) contradicting the testimony of Berry, Lee and Berry's son that Simpson threatened Drake's life. Although neither side seems to have recognized the difficulties presented by that aspect of Simpson's Petition, it merits more than cursory discussion.

In Simpson's current submissions he repeats the assertions made in his briefs to the Illinois Appellate Court that William Simpson, Sr., Annie Simpson and Duane Thomas would have testified that

---

**10.** Those considerations also undercut the argument that Simpson pressed at the post-trial hearing, but has not repeated in his current submissions, to the effect that Cooney should have checked with post office or public aid records to obtain forwarding addresses of those alibi witnesses Cooney could not reach. Even though looking at such records no doubt would have made Cooney's investigation that much more thorough, Simpson has not presented any evidence that a more thorough investigation would in fact have turned up anything useful in Simpson's defense.

Simpson's relationship with his mother-in-law was hostile, even though Lee herself testified (R.848–49) that she harbored no animosity toward Simpson. Simpson also says that Michael Thompson would have testified that he had accompanied Simpson when Simpson went to Berry's home on October 16 or 17 to retrieve his belongings after the separation with Berry and that Simpson did not threaten Drake on that occasion.

After Simpson had presented those arguments in the first post-trial hearing and the Appellate Court remanded the case for a new hearing with new counsel to represent Simpson, on remand Simpson made no offer of proof with respect to his impeachment witnesses and failed to argue that aspect of his ineffective assistance claim. Accordingly, neither the trial court nor the Appellate Court made a finding on the merits of that argument, and Simpson in effect raises it for the first time here. That raises the serious question whether the Petition is entirely doomed as a "mixed" petition under *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982)—that is, whether that claim should be viewed as unexhausted in the habeas sense.

Exhaustion of state remedies requires petitioner to have "fairly presented" a claim to the state court by "clearly inform[ing] the state court of the factual basis of that claim and [arguing] to the state court that those facts constituted a violation of the petitioner's constitutional rights," (*Varnell v. Young,* 839 F.2d 1245, 1248 (7th Cir.1988), quoting *Toney v. Franzen,* 687 F.2d 1016, 1021 (7th Cir.1982)). Here Simpson has clearly failed to make such a presentation, because his failure to reassert his impeachment arguments after the first remand deprived the Illinois courts of an opportunity to pass on his contentions. Nevertheless, this Court may still reach the merits of Simpson's current habeas petition if Simpson would not now be able to obtain a meaningful remedy in a state proceeding.

■ Here the issue is whether Simpson would still be able to mount an Illinois Post–Conviction Act (Ill.Rev.Stat. ch. 38, ¶¶ 122–1 to 122–7, the "Act") challenge to his conviction on the ground of his trial counsel's failure to present the impeachment witnesses in spite of Simpson's failure to raise the issue in the second post-trial hearing. This Court determines he could not.

Simpson is precluded from petitioning for post-conviction relief on that last-mentioned claim by his obvious waiver of that claim in the second post-trial hearing (the post-remand hearing). It would be hard to find a more appropriate application of the concept of waiver—the voluntary relinquishment of a known right. Where, as here, the very argument now sought to be made was presented to the trial court and rejected, and the Appellate Court remanded with an invitation to Simpson to try again, Simpson's failure to do so as to that one argument must mean he has waived that argument in the state court system.

As our Court of Appeals recently summarized (*Rodriguez v. Young,* 906 F.2d 1153, 1158–59 (7th Cir.1990)), that leaves Simpson with three options: (1) show cause for, and actual prejudice resulting from, his state procedural default under *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977), (2) relatedly show that the default constituted an independent Sixth Amendment violation under *Strickland,* 466 U.S. at 668, 104 S.Ct. at 2055 [11] or (3) show his conviction to have been a "fundamental miscarriage of justice" under *Murray v. Carrier,* 477 U.S. 478, 495–96, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986). Simpson has done *none* of those things. Without any attempt to show that his waiver of that one argument in the state courts was excusable or was the result of ineffective assistance of counsel, or to show that a waiver finding would be fundamentally unfair, Simpson is foreclosed from asserting the argument as

---

**11.** Of course this second possibility is often left out of lists such as this because it is really subsumed in the possibility of review under *Wainwright*—ineffective assistance is itself "cause" under *Wainwright,* and *Strickland* requires a showing of prejudice.

a basis to make a collateral attack on his conviction.

That would end the issue but for the potential that Simpson might complain that here the state did not raise the waiver issue of its own accord—and hence perhaps waived its own waiver defense. Our Court of Appeals wrestled with that possibility in *Henderson v. Thieret*, 859 F.2d 492, 497 (7th Cir.1988) and held that the district courts may, in at least some circumstances, raise the issue of waiver by a petitioner sua sponte.[12] Where the state has not by its conduct manifested an intent to waive a defense that is so clearly applicable, this Court is reluctant to find an actual waiver of that defense. Accordingly it reaches the merits of the *state's* defense of waiver and, as explained in the preceding paragraph, finds Simpson's attempt to resuscitate his waived claim wanting.[13]

### Marital Privilege

■ Simpson claims that he was denied a fair trial when the trial court admitted into evidence, over Simpson's objection grounded on the marital privilege, Velma Lee's testimony about a Simpson–Berry conversation that she overheard. Lee testified that in August 1980 Drake drove up to the Berry residence while Lee was sitting on the porch, and she and Drake spoke for a time. After Drake left, Lee remained on the porch for 15 to 20 minutes before she went upstairs to the living room of Berry's apartment. Simpson and Berry were talking in Berry's bedroom, which was located off the living room within 15 or 20 feet from where Lee was seated. Lee testified that when she heard Berry tell Simpson that there was nothing between her and Drake, Simpson replied that he would "get the nigger."

■ Simpson claims the trial court's admission of that statement into evidence violated Ill.Rev.Stat. ch. 38, ¶ 155-1 (1977), which at the time of the trial read:

> In all criminal cases, husband and wife may testify for or against each other: provided, that neither may testify as to any communication or admission made by either of them to the other or as to any conversation between them during marriage [with exceptions not pertinent here].

Although the parties lock horns on whether Simpson's statements lost their confidentiality by being made in close proximity to where Lee was sitting, that is really irrelevant here where Simpson is not challenging testimony by Berry. Marital privilege applies only to confidential interspousal statements testified to *by a spouse. People v. Simpson*, 68 Ill.2d 276, 280, 12 Ill.Dec. 234, 237, 369 N.E.2d 1248, 1251 (1977), citing McCormick, *Evidence* § 82 at 167 (2d ed. 1972), restates the generally accepted view of the admissibility of testimony by eavesdroppers:

> [O]ne in whose presence a communication between spouses is made may testify to that conversation, even though the

---

**12.** In *Henderson, id.* the circumstance that justified the district court in raising the waiver defense was that the state had raised the waiver defense as to some issues but not others, and the court merely invited the state to raise the defense as to all issues. Although that did not happen in the current case, *Henderson* did not limit the sua sponte raising of waiver to such circumstances.

**13.** Even if Simpson had tried to assert cause (e.g., any claimed ineffective assistance by his second appointed counsel), he would have been unable to show prejudice. His argument for ineffective assistance by his trial counsel based on the claimed impeachment witnesses is simply too tenuous. First, the decision not to present the impeachment witnesses would appear to have been a calculated strategic choice by Simpson's counsel—in consultation with Simpson—to avoid tarnishing Simpson's own credibility as to the critical issue of the voluntariness of his confessions by putting before the jury potentially unreliable witnesses of dubious credibility on tangential issues. Even if it were mere oversight, however, it clearly would have had no bearing on the outcome of Simpson's case. Unless the jury had credited the police witnesses' description of events surrounding Simpson's confession and therefore accepted Simpson's admission of guilt, it could not reasonably have convicted Simpson on the strength of testimony that Simpson had previously threatened Drake. Conversely, even without the testimony of Berry or Lee Simpson would undoubtedly have been convicted on the strength of the confessions alone. Thus no amount of impeachment of Berry or Lee could have materially altered the outcome of the case.

witness overheard the conversation by eavesdropping.

Although that statement is dictum in that (wholly unrelated) *Simpson* case, Simpson's argument that the trial and appellate courts both erred by relying on that statement of the law is wholly unconvincing. Marital privilege is a matter of state law, and this Court may not ignore such a clear statement by Illinois courts that the privilege does not apply here. But the clincher for present purposes, of course, is that there is nothing to suggest that the evidentiary ruling—even had it been incorrect—violated Simpson's *constitutional* rights. Whether or not the Illinois privilege properly extends to Lee's testimony, the Constitution surely does not mandate that it do so (see, e.g., *Wolfle v. United States*, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934) and *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), each of which discussed the corresponding federal rules of marital privilege solely in terms of statutory and common-law rights, *not* as a constitutional right).

### Voluntary Manslaughter Instruction

■ Simpson claims the trial court also erred by refusing to instruct the jury that it could find Simpson guilty of voluntary manslaughter instead of murder if it found he acted either pursuant to a sudden and intense provocation or an unreasonable belief that he was acting in self-defense. Simpson correctly cites *People v. Lockett*, 82 Ill.2d 546, 45 Ill.Dec. 900, 413 N.E.2d 378 (1980) for the proposition that a defendant is entitled to have the jury consider any legally recognized theory that has some foundation in evidence, however tenuous—but he fails to show even a tenuous foundation for a voluntary manslaughter instruction in this case.

Simpson claims that the jury could have found that Simpson killed Drake as a result of intense provocation during a quarrel with Drake regarding the claimed adulter-

ous affair between Drake and Simpson's wife. Simpson bases that defense on the already-referred-to testimony by Higgins and Cleven that Simpson confessed to meeting Drake on the night of the murder, accusing Drake of having an affair with Berry and shooting Drake in the back when Drake turned around and started to reach into the van. According to Higgins, Simpson told him that he shot Drake in the back because "I didn't want to give him a chance."

Simpson first claims that provides sufficient evidence for a jury to infer that Simpson felt threatened and shot Drake to deprive him of the opportunity to reach into the van for a weapon. At the time of the killing Ill.Rev.Stat. ch. 38, ¶ 9–2(b) (1973) [14] said voluntary manslaughter occurs where a defendant kills because:

> at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in [¶¶ 7–1 to 7–14], but his belief is unreasonable.

One of the circumstances that would justify a killing is where (Ill.Rev.Stat. ch. 38, ¶ 7–1):

> he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony.

Here, however, there is really no evidence from which a jury could reasonably have concluded that Simpson had a subjective belief—however unreasonable—that Drake threatened him with imminent death or great bodily harm. According to Cleven, who related Simpson's confession in basically the same terms as did Higgins, Simpson stated that Drake never threatened him and that Simpson did not see that Drake had a weapon. Nor was Drake subsequently found to have had one. Simpson has not pointed to any evidence that would enable a jury to believe the part of Simpson's confession that made reference

---

**14.** In 1987 that statute was substantially reworked to provide for first and second degree murder, with second degree murder encompassing most offenses that would previously have been involuntary manslaughter. This opinion, of course, applies the older statutory version, which applied to Simpson's pre–1987 conduct.

to Drake's reaching into the van but to disbelieve Simpson's statement to Cleven that he did not view Drake's act as threatening at the time. Accordingly, a voluntary manslaughter instruction was no more necessary here than in *People v. Bratcher*, 63 Ill.2d 534, 540–41, 349 N.E.2d 31, 34 (1976), where the court said:

> To hold otherwise would permit a defendant to demand unlimited instructions, which are wholly unrelated to the case but are based upon the merest factual reference or witness's comment.

Nor did the trial court err in refusing a voluntary manslaughter instruction based on spousal adultery. On that score the Appellate Court's reasoning, based as it is on an accurate view of the law and fully supported by the factual record, requires no elaboration (129 Ill.App.3d at 840, 84 Ill.Dec. at 957, 473 N.E.2d at 363):

> An instruction based on discovery-of-adultery provocation "has generally been limited to instances where the parties are discovered in the act of adultery or immediately before or after such act, and the killing immediately follows such discovery. [Citations.]" (*People v. Harris* (1983) [1984], 123 Ill.App.3d 899, 904 [79 Ill.Dec. 476], 463 N.E.2d 1030.) This general rule has been the subject of exception in limited circumstances where "the revelation of adultery was but one of a series of statements or circumstances found by the courts to be so provoking as to constitute an exception to the general rule in Illinois that words alone cannot constitute sufficient provocation to reduce a murder to voluntary manslaughter." (123 Ill.App.3d 899, 905 [79 Ill.Dec. 476, 463 N.E.2d 1030].) Here, the facts do not establish that the defendant shot Drake immediately following discovery of the parties in an adulterous act. Nor do the facts indicate a series of exceptionally provoking statements or circumstances within the limited exception justifying a voluntary manslaughter instruction. As a result, we find no error in the trial court's refusal to give a voluntary manslaughter instruction based upon discovery-of-adultery provocation.

But once again, as with the marital privilege issue, Simpson's counsel mistakenly does no more than rehearse the arguments that Simpson made before the Illinois courts. On federal habeas review a petitioner must do much more than merely show (if it is true) that the Illinois courts erred by failing to give a voluntary manslaughter instruction. *Williford v. Young*, 779 F.2d 405, 406 (7th Cir.1985) sets a nearly unattainable standard for petitioners seeking to set aside a state conviction for failure to give a manslaughter instruction:

> The test in these circumstances is clearly established.
>
> > The failure to instruct on a lesser included offense, even if incorrect under state law, does not warrant setting aside a state conviction unless "failure to give the instruction could be said to have amounted to a fundamental miscarriage of justice."
>
> *Nichols v. Gagnon*, 710 F.2d 1267, 1269 (7th Cir.1983) (citation omitted). Examination of the law and evidence reveals that Williford cannot satisfy this test. Williford cites no case in which failure to instruct the jury as to a lesser included offense in similar circumstances was found to be a denial of due process. This court's own research has similarly found no such case.

Nothing in the intervening years has occurred to lower that standard, nor has this Court's independent research uncovered any post-*Williford* case in which the standard has been found satisfied. Because Simpson has failed to present enough evidence of mitigating circumstances even to require a voluntary manslaughter instruction under *Illinois* law, he has a fortiori failed to show the "fundamental miscarriage of justice" necessary to entitle him to relief here.

### Prosecutorial Misconduct

█ Finally Simpson complains of numerous transgressions by the prosecution that he says prejudiced his case in the eyes of the jury. Those matters do not rise to

the level of due process violations either singly or collectively.

First, Simpson complains that the prosecutor attempted to convince the jury that Simpson was a "bad man" by inviting various witnesses to testify to acts by Simpson that were either criminal or would at least tend to suggest that Simpson is not very nice. In particular, Simpson complains that the prosecutor asked director McGuire of the Community Health Program drug treatment program questions intended to create the innuendo that Simpson had registered under an alias to obtain methadone after signing an affidavit stating that he had not obtained methadone by fraud (R.657–58). When McGuire was asked whether a person wishing to obtain methadone had to sign such an affidavit, Simpson's objection to the question was sustained before McGuire began to answer. After the prosecutor asked some more questions pertaining to procedures at the clinic, he again asked whether the clinic required applicants to complete a form that specified that the applicant would not use fraud to obtain methadone. Again Simpson objected, and again the objection was sustained before McGuire started to answer.

Simpson also complains that the prosecution tried to show that Simpson was a "bad guy" by placing before the jury evidence of several alleged assaults by Simpson against Berry. Berry was asked about an instance in August 1980 when Simpson purportedly became suspicious of a man outside Berry's house and, unsatisfied with Berry's explanation, "got violent and pulled a knife out" (R.265–68). After a sidebar the trial court ruled the evidence inadmissible as a privileged marital communication and instructed the jury to disregard the entire conversation. That line of questioning went no further.

Later, the trial court again had to instruct the jury to disregard testimony about an assault when Lee told of having on another occasion heard Berry tell Simpson to stop hitting her (R.489–90). After the trial court had that statement stricken from the record and instructed the jury to disregard it, Lee again stated that Berry had told Simpson to stop hitting her. Counsel for Simpson again objected, the trial court again sustained the objection and instructed the jury to disregard that testimony (R.491). When Lee's testimony resumed for a third time she began the same story and the trial court *again* sustained Simpson's counsel's objection and instructed the jury to disregard Lee's statement (R.492). On none of those three occasions, however, did the prosecution invite Lee to relate any threats by Simpson against Berry. On the contrary, Lee's repeated statements in that regard were made in direct contravention to the prosecution's request that she refrain from revealing that portion of the conversations she heard.

In addition, Simpson complains (P.Mem. 22–23) that the prosecution attempted to "enhance the portrait of petitioner as a bad person capable of all manner of unspeakable deeds, and the victim as a loving and responsible son and brother." That latter portrait was assertedly sought to be painted by the prosecutor's having elicited testimony, and having repeated in closing argument, that the victim had been living with his invalid mother and retarded brother.[15]

Under the circumstances here, it is useful to view those allegations of misconduct through the lens of *Hearn v. Mintzes,* 708 F.2d 1072, 1077 (6th Cir.1983) as adopted and adapted for general use by our Court of Appeals in *Rose v. Duckworth,* 769 F.2d 402, 405 (7th Cir.1985):

1. Were the comments or the actions of the prosecutor intended to reflect unfairly on the defendant's guilt or innocence or were they so prejudicial or inflammatory that they would "naturally and necessarily" imply that the defendant was guilty of the crime charged;

---

**15.** In his earlier post-trial proceedings before the Illinois courts Simpson challenged a substantial number of other purported transgressions by the prosecution. Those challenges were uniformly rejected, however, and Simpson's current petition does not further pursue those challenges in this Court.

2. Were the remarks or actions isolated or extensive;

3. Was the evidence of guilt otherwise overwhelming; and

4. What curative instructions were given, and when?

In those terms it is clear that Simpson was not denied a fair trial as a result of the complained-of prosecutorial activity.

First, this Court concurs with the Illinois Appellate Court in its conclusion (129 Ill. App.3d at 835–38, 84 Ill.Dec. at 954–56, 473 N.E.2d at 360–62) that, although the prosecution's performance was less than exemplary, none of the apparent transgressions was deliberately calculated to be inflammatory. Evidence of either the presence or absence of bad intent is, of course, hard to compile in circumstances such as these (see *Rose*, 769 F.2d at 405), but it is significant that in none of the complained-of instances did the prosecution engage in a surreptitious and repeated effort to slip the evidence into the record before the jury. In only one instance [16]—when the prosecutor asked McGuire twice whether applicants to methadone treatment programs must affirm that they will not use fraud to obtain methadone—did the prosecutor ask an impermissible question after having an objection sustained. And in that instance the objection was general and the prosecutor seems to have rephrased the question on the assumption that the objection was as to form rather than substance. When that did not work, the prosecutor dropped that line of questioning altogether.

Nor would any of the testimony Simpson complains of have "naturally and necessarily" implied that Simpson was guilty of the crime charged. None had anything to do with past murders. Nor did any of the testimony concern acts bearing directly or indirectly on the Drake homicide or linking Simpson to that event. At worst the questions posed to McGuire would have added to the jury's suspicions as to Simpson's veracity, but not so seriously as to have deprived Simpson of a fair trial. Nor would any comments about Drake's family have prejudiced Simpson where they were

not presented in a manner that would lead the jury to believe it to be material to Simpson's guilt. More serious is the possibility that the testimony of Berry and Lee could have left the jury with the impression that Simpson was prone to violence. Although that danger is real, in this Court's view the slight (though unquantifiable) possibility that a jury would jump from (1) the fleeting glimpses that the testimony gave of possible violence by Simpson to (2) the conclusion that he is a murderer cannot justify habeas relief.

■ As for the second factor, the complained-of questions and answers were truly isolated. This Court's inquiry into the fairness of Simpson's trial must of course consider claimed prosecutor misconduct in the context of the entire trial (*United States ex rel. Garcia v. Lane*, 698 F.2d 900, 902 (7th Cir.1983)). Here Simpson basically complains about four instances that took place in the course of a trial that lasted over four days and included testimony from 13 witnesses. As *United States v. Hasting*, 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983) (citations omitted) said:

[T]here can be no such thing as an error-free, perfect trial, and ... the Constitution does not guarantee such a trial.

Third, both the trial (Supp.R.IV 43) and appellate courts (129 Ill.App.3d at 838, 84 Ill.Dec. at 956, 473 N.E.2d at 362) specifically found the evidence of Simpson's guilt manifestly overwhelming, and this Court—after a searching review of the record below—finds ample support in the record for that conclusion. Simpson has not met his burden of rebutting the presumption of correctness that federal courts must give state court findings of fact on habeas review under Section 2254(d) (see *Sumner v. Mata*, 449 U.S. 539, 543–47, 101 S.Ct. 764, 767–69, 66 L.Ed.2d 722 (1981)).

Fourth and finally, the most potentially prejudicial of the instances Simpson complains of—the testimony by Berry and Lee tending to show violence by Simpson—were adequately and quickly dealt with by

16. As has been noted, Lee's repeated references to having heard Berry tell Simpson to stop hitting her were not responsive to prosecution questions—instead they occurred *in spite of* the prosecution efforts to keep Lee from straying into that area of testimony.

the trial judge in striking the testimony from the record and instructing the jury not to consider it. It is generally presumed that the improper presentation of evidence to the jury is cured by an instruction that the jury is to disregard it unless the testimony left such an impression on the jury that no curative instruction could purge the prejudice created by the tainted evidence (see, e.g., *United States v. Reagan*, 694 F.2d 1075, 1080 (7th Cir.1982)). Here there are no special circumstances to suggest that the jury would be unable to follow the instruction to disregard.

In sum, the four factors of *Rose v. Duckworth* weigh heavily against granting the relief Simpson seeks. Simpson was able to present his evidence at trial, and nothing the prosecutor did detracted from its fairness as a whole.[17]

### Conclusion

This Court has reviewed in detail the record and rulings of the state courts and finds no errors of constitutional magnitude such as to entitle Simpson to habeas corpus relief. Accordingly the petition is denied and this action is dismissed.

---

**17.** To see to what lengths our Court of Appeals has allowed prosecutors to go in trying to "poison the well" where the evidence of guilt was otherwise overwhelming, contrast this Court's opinions in *United States ex rel. Crist v. Lane*, 570 F.Supp. 999 (N.D.Ill.1983) and on reconsideration, 577 F.Supp. 504 (N.D.Ill.1983) with our Court of Appeals' reversal at, 745 F.2d 476 (7th Cir.1984). Compared with what the prosecutor in that case did—and got away with—the things about which Simpson now complains certainly seem uncontroversial, if not indeed de minimis.